ESTATE OF Al J. SCHNEIDER, Donald J. Schneider, et al., Personal Representatives, and Agnes Schneider, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 87–2711.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1988.

Decided Aug. 23, 1988.

Robert E. Nelson, Nelson & Schmeling, Green Bay, Wis., for petitioners-appellants.

David I. Pincus, Atty. Gen. Office, Washington, D.C., for respondent-appellee.

Before CUMMINGS, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Al J. Schneider ("Schneider") was the principal shareholder of American National Corporation ("ANC"), a holding company, which in turn owned 100% of the stock of Schneider Transport, Inc. ("Transport"). In 1974, 1975 and 1976 Schneider sold portions of his ANC stock to certain Transport employees who were participating in an employee stock ownership plan. Schneider reported these transactions on the 1974–76 federal income tax returns he filed jointly with his wife, Agnes Schneider, characterizing them as sales of capital assets which generated long-term capital gains. The Internal Revenue Service (the "IRS") alleged that these sales actually constituted a redemption of Schneider's stock by ANC followed by a distribution of this stock pursuant to the employee stock ownership plan. The IRS asserted that Schneider should

have reported the entire amounts he received from these alleged sales as dividend distributions. The IRS therefore issued deficiency notices for 1975 and 1976. The matter proceeded to trial and the Tax Court entered judgment against Schneider and his wife for $17,046 and $20,716 for the tax years of 1975 and 1976 respectively.[1] We affirm.

## I.

Transport was founded by Schneider in 1938 and is engaged in the freight transport business. Transport was one of a group of closely held corporations (the "affiliated corporations") owned by Schneider and his immediate relatives. In 1971 Transport adopted an employee stock bonus plan (the "Transport Plan"). Under the plan, Transport's Board of Directors determined in December of each year the total sum to be awarded by Transport to certain of its employees as bonuses for work done in that year. Early in the following year Transport's President selected and notified the employees who would receive bonuses. These employees were given an option to receive their bonus in either cash or Transport nonvoting common stock. Employees who elected stock received previously unissued Transport nonvoting common stock; the number of shares received was based on the "Current Formula Price" (the book value of the stock with some modifications).

A bonus recipient's rights in the stock he or she received under the Plan were subject to a 10%-per-year vesting requirement. If the employee ceased to work for Transport within ten years of receiving the stock, he or she was required to offer to sell the stock to Transport at a price equal to 10% of the Current Formula Price for that year multiplied by the number of years of continued employment since the

1. The facts of this case are set out in great detail in the Tax Court's opinion. *Estate of Al J. Schneider v. Commissioner of Internal Revenue,* 88 T.C. 906 (1987). We set forth only those facts pertinent to this appeal.

The stock which was allegedly sold to the Transport employees was owned by Al Schneid-

er, but because Al and Agnes Schneider filed joint federal tax returns, the Tax Court petition was filed jointly by the Schneiders. In addition, on March 2, 1983 Al Schneider died and his estate was substituted as a party. For convenience and simplicity we hereinafter refer only to Schneider.

year the bonus was awarded. In addition, an employee wishing to sell any stock received pursuant to the Transport Plan was required to first offer the stock to Transport at the same price that would govern under the vesting rules. The plan required that notice of these restrictions be stamped on the stock certificates issued to the bonus recipients.

In 1973, the affiliated corporations were substantially reorganized. ANC was formed to act as a holding company for these corporations. Pursuant to the reorganization, former Transport shareholders received ANC stock in exchange for their Transport stock. As of January 1, 1974, the Schneiders and their relatives owned 100% of ANC's class A voting stock and 99.6% of the class B nonvoting shares. In addition, on this same day the members of the Schneider family and ANC entered into "the American National Non–Employee Buy–Sell Agreement" (the "Buy–Sell Agreement"). Under the Buy–Sell Agreement ANC was given a right of first refusal at the Current Formula Price before any Schneider family shareholder could sell his or her stock to a third party. Stock received by employees under the Transport Plan or the later adopted ANC Plan was not subject to this agreement.

ANC also substantially adopted the Transport Plan, including the vesting requirements, for its employees and for all employees of its subsidiaries, including Transport. The secretary and president of ANC were authorized to issue the number of class B nonvoting shares necessary to implement what was now called the American National Employee Stock Ownership Plan ("the ANC Plan"). The ANC Plan, as later amended, differed from the Transport Plan in that the stock the bonus recipients would receive pursuant to the plan was not required to be issued directly by ANC in the first instance; rather, in the Board of Director's discretion the stock could be already outstanding stock that the bonus recipients purchased from existing class B shareholders. In addition, ANC waived its right of first refusal under the Buy–Sell

Agreement for all shares furnished by Schneider to carry out the needs of the plan.

Schneider sold a small portion of his class B stock to employees pursuant to this arrangement in 1974, 1975, and 1976. The payment of the 1975 bonus, the first year in which the IRS assessed a deficiency, serves to illustrate the mechanics of the plan.[2] On December 28, 1974 Transport's Board of Directors determined that the total amount of bonuses to be awarded for work related to 1974 would be $166,000. On February 20, 1975 certain employees were notified that they would receive a bonus, but were not told the exact amount of their individual bonuses. These employees were then required to elect pursuant to the American National Employee Stock Ownership Plan Undertaking and Agreement ("the Undertaking and Agreement") whether to receive at least 25% of their bonus as ANC class B stock. On April 4, 1975 the bonus recipients were notified of the exact amount of their bonuses. Those employees who had committed to take at least 25% of their bonus in stock were then required to specify the exact percentage that they would take in this form.

Transport paid the bonuses on April 21, 1975. Those employees electing to receive a portion of their bonus in the form of ANC class B stock received two checks. The first check was for the cash portion of the bonus, the second for the amount to be received in stock. On the back of the second check was stamped "pay to the order of Al J. Schneider." Each employee who received two checks was instructed by a supervisor to sign the endorsement on the second check. The checks were collected and then transferred to Schneider. Schneider in turn deposited the checks in the Schneiders' personal account. On May 12, 1975, ANC issued a total of 9,623 shares of class B stock to those employees who elected to receive a portion of their bonus in this form. The certificates these employees received, however, were not subject to the Buy–Sell Agreement but rather were subject to the terms and conditions of

**2.** The bonus related to work performed in 1974, but was actually paid to the employees in 1975.

the ANC Plan, including the vesting provisions. Notice of these restrictions was stamped on the stock certificates. On the same day, Schneider's class B certificate was cancelled and a new certificate issued representing 9,623 fewer shares. Schneider's stock continued to be subject to the Buy–Sell Agreement.

## II.

### A.

On appeal, the issue is how Schneider's sales of his ANC class B nonvoting stock to Transport's employees should be characterized for tax purposes. It is Schneider's position that the transactions which occurred should be respected. He contends that Transport paid cash bonuses to a select number of its employees and these employees decided to purchase the ANC stock from Schneider. Because the shares were capital assets in Schneider's hands and were sold in bona fide sales to Transport's employees, in Schneider's view, he correctly reported as a capital gain each year the sum of the differences between the selling prices and his tax basis· in the shares he sold.

The Tax Court rejected this view. The court held that the transactions involving the payment of the 1975 and 1976 bonuses and stock sales should be characterized as stock redemptions followed by distributions of the redeemed shares as compensation to the electing bonus recipients.[3] The Tax Court specifically found that the intended employee compensation was the stock, not the preendorsed checks.[4]

Once the transactions are characterized in this manner, the appropriate tax treatment for Schneider's exchange of his stock for cash is determined by the rules governing stock redemptions.[5] Schneider concedes on appeal that if it is determined that his stock was redeemed by ANC, the sum he received is properly taxed as ordinary income to him. 26 U.S.C. §§ 301, 316.[6]

3. There is some confusion generated by the fact that ANC, the holding company, adopted the ANC Plan for its employees and "employees of all its subsidiary and affiliated corporations." The confusion centers on whether in the Tax Court's view, ANC or Transport distributed the stock to the participants in the ANC Plan. The ANC Plan seems to have originally contemplated that Transport would distribute the ANC stock. The minutes of the January 1, 1974 Board of Directors' meeting state that "[a]s to those employees who choose stock, Transport, or the other subsidiary and affiliated corporations ... will transfer to [ANC] the cash to buy newly-issued shares from [ANC]." This is corroborated by the fact that the Transport Board, not the ANC Board, voted on the total size of the bonus that Transport would award each year. In addition, minutes from the March 17, 1974 Board of Directors' meeting state that if ANC issued new stock to meet the requirements of the Plan, "Transport would have to pay cash into [ANC] for the shares to be issued." Although there is some conflicting evidence (and the IRS and the Tax Court often fudge the issue), *see, e.g., Schneider,* 88 T.C. at 916 n. 7, 942, we assume when discussing the IRS's and the Tax Court's position that Transport administered the employee stock ownership plan in the same manner as it did prior to 1974, only that after this date it used ANC stock, not its own. Accordingly, under this position, Schneider's ANC stock was redeemed by ANC and then issued to Transport in exchange for cash, the amount corresponding to the sum of the second checks. Transport in turn distributed the stock to its employees pursuant to the plan. Further, even if Transport, not ANC, is considered to have redeemed Schneider's stock, under § 304 of the Internal Revenue Code, Transport would be deemed to have first distributed the cash to ANC which then used the cash to redeem Schneider's stock.

4. The Tax Court employed the step-transaction doctrine, ruling in part that the employees were mere conduits for the "second check" and therefore the cash flowed directly from Transport to Schneider. We approach the other half of the transaction, focusing on how the stock got from Schneider to the Transport employees. Because we hold that there were more steps—the stock was transferred to ANC, Transport and then to the employees—than Schneider would wish to recognize, we do not speak in terms of the step-transaction doctrine.

5. A redemption is defined as a corporation's "acqui[sition]" of its stock in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as Treasury stock." 26 U.S.C. § 317(b).

6. Generally property received by a shareholder of a corporation from that corporation with respect to his or her stock ownership is treated as a dividend distribution and the entire amount of the distribution is ordinary income to the shareholder. 26 U.S.C. §§ 301, 316. Section 302(b) enumerates certain circumstances in

The Supreme Court has stated that "[i]t is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." *United States v. Cumberland Public Service Co.*, 338 U.S. 451, 456, 70 S.Ct. 280, 282, 94 L.Ed. 251 (1950). We therefore review the Tax Court's characterization under a clearly erroneous standard.

### B.

This case involves a series of transactions structured in a manner which ostensibly achieved preferential tax treatment from the perspective of the taxpayer. The right of a taxpayer to arrange his or her affairs to minimize taxes is well established. The Supreme Court observed long ago that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his [or her] taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). But to state this principle is not to decide the case. *See generally*, Gunn, *Tax Avoidance*, 76 Mich.L.Rev. 733 (1978). In *Gregory*, for example, the Court proceeded to disregard the taxpayer's carefully arranged corporate reorganization. In so doing, the Court asked: "Putting aside, then, the question of motive in respect of taxation altogether, and *fixing the character of the proceeding by what actually occurred, what do we find?*" *Gregory*, 293 U.S. at 469, 55 S.Ct. at .267 (emphasis added).

Applying this same approach to the present situation, we affirm the Tax Court's characterization of Schneider's stock sales as constructive redemptions. As the Tax Court observed, "[a]t the start of each year's stock bonus process, [Schneider] had stock and the corporations had funds. At the end of each year's stock bonus process, [Schneider] had funds that came from the corporations, and the corporations' employees had stock that came from [Schneider]." *Estate of Al J. Schneider v. Commissioner of Internal Revenue*, 88 T.C.. 906, 941 (1987). Our specific focus is on how ANC class B stock which Schneider initially held subject to the restrictions imposed by the Buy–Sell Agreement ended up in the hands of Transport employees subject to the limitations of the ANC Plan. We agree with the explanation arrived at by the Tax Court: a redemption followed by a stock distribution.

Schneider attempts to avoid this characterization by emphasizing that the Tax Court specifically found that he was not in need of cash at the time of the alleged stock sales. In Schneider's view this indicates that the arrangement was not an effort to "bail" money out of the corporation at capital gain rates, but rather was motivated by legitimate business purposes. He claims that the structure of the transaction was designed to facilitate the administration of the ANC Plan. In order to implement the plan, Transport was required to obtain the ANC shares necessary to meet its obligations to those employees who elected to receive ANC stock. The principal operating officer, Schneider's son, testified that it was not desirable to satisfy these obligations by having ANC issue new shares to Transport because it would dilute the ownership interests of ANC's existing shareholders. In addition, the issuance of new ANC stock would have resulted in a troublesome cash build-up in ANC. As the minutes of ANC's board of directors' meeting explain:

> At present, [ANC] is functioning only as a holding company. If newly issued

which a shareholder treats the acquisition of his or her stock by the issuing corporation in return for property as an exchange of this stock. If the stock is a capital asset, then any gain realized would be a capital gain. Schneider now agrees, however, that the exceptions set forth in § 302(b) are not applicable to his situation.

As discussed *infra*, Schneider argues that the business purposes motivating the stock purchase arrangements are relevant to determining whether these transactions should be recharacterized as stock redemptions, but not to the specific application of the "not essentially equivalent to a dividend" standard set forth in § 302(b)(1). *See United States v. Davis*, 397 U.S. 301, 312, 90 S.Ct. 1041, 1048, 25 L.Ed.2d 323 (1970) (holding that the business purpose of a transaction is irrelevant in determining whether a redemption is substantially equivalent to a dividend).

stock of [ANC] is to be used to provide the shares necessary under the [ANC] Plan, *Transport would have to pay the cash into [ANC] for the shares to be issued.* [ANC] would then have little use for this cash and would probably either have to lend it back to Transport or contribute it to Transport capital.

*A simpler method is to merely give the employee the cash and let him buy the stock from [Schneider].* [Schneider] stated that he was willing to accommodate the [ANC] Plan in this manner, at least this year. . . .

(emphasis added). The unstated byproduct of this arrangement was that Schneider would allegedly receive capital gains treatment when he relinquished his shares.

The fact that Schneider did not need cash and therefore allegedly did not have a tax motive for participating in this particular arrangement is not dispositive. *See Cumberland,* 338 U.S. at 455, 70 S.Ct. at 282 (upholding taxpayers arrangement despite finding that it was predominantly motivated by tax purposes); *Gregory,* 293 U.S. at 469, 55 S.Ct. at 267 ("the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended"). *See also* Gunn, *Tax Avoidance,* 76 Mich.L.Rev. at 745 (noting that the value of using a "tax motive" test to decide cases is seriously impaired by the fact that "most transactions are taxed without regard to the presence or absence of a tax motive.") (footnote omitted). Schneider must show that the legal restrictions applicable to the stock can be reconciled with his position that the stock was sold directly to Transport's employees. This he cannot do.

Schneider claims that the cash payment and stock sales must be viewed as independent steps for tax purposes. He asserts that the bonus recipients constructively received their bonus entirely in cash at the time they were required to elect the form their bonus would take. In Schneider's view, cash is the standard form of compensation and the election itself constituted an independent step under which an employee who received cash chose to use a portion of it to purchase stock.

Even if we assume that this characterization of the specific operation of the election feature is correct, it does not indicate whether Transport or Schneider was the direct source of the stock that the electing bonus recipients received. The Transport Plan and the later ANC Plan (American National Employee Stock Ownership Plan) were adopted to attract, retain, and motivate top managerial personnel by providing "an equity position" in the parent holding company. In the typical situation where a bonus plan involves a stock ownership component, the company is the source of the stock. The amount of the bonus represents compensation to the employee; that the employee can opt to receive a portion of the bonus as stock does not usually alter the fact that the bonus, in whatever form, is received directly from the employer. Indeed, this was how the Transport Plan operated from its adoption until 1974.

That bonus plans generally function in this manner, however, does not mean that variations are automatically problematic; a subtler argument seems both possible and implicit in Schneider's position. It can be contended that Transport merely arranged and facilitated the stock sales without actually having acted as a principal in the transactions. Under this position, Transport's stated goal of having its managerial personnel own stock was achieved by *making it possible* for these employees to purchase stock on attractive terms from a separate source, Schneider, and by assisting the employees in carrying out the sales by pre-endorsing and collecting the checks on Schneider's behalf. If we accept this view, Transport's bonuses to its employees consisted of cash and the value of the service of making ANC class B stock available to employees at the given price. Prior to 1974, employees who received cash bonuses could turn around and purchase stock from Transport. From 1974–76 Transport continued this basic format, but instead of acting as the seller, it arranged to make the stock available through Schneider.

In other circumstances it may be a difficult task to determine whether non-cash property arranged by the employer on an elective basis should be viewed as acquired by the employer from a third-party provider of such property and then distributed by the employer to the employee. The alternative position, that the employer pays only cash to the employee as compensation and then for the employee's convenience, and upon his or her election, transfers the cash to the third-party on behalf of the employee may not be implausible. Generally this distinction will not matter because our focus is on the tax ramifications to the third-party which will typically not vary regardless of whether the property is deemed sold to the corporation or the corporation's employees. For most kinds of property, a third-party seller will usually recognize the same type of gain or loss in either case. The issue becomes critical here only because the property is stock and Schneider is a substantial shareholder in ANC. As previously discussed, in this situation the tax consequences to Schneider vary depending on whether he sold his stock to a third party as opposed to having it redeemed by ANC. Because the documents executed in these transactions indicate that the ANC stock the electing bonus recipients received did not move directly from Schneider to the employees, we hold that Schneider's stock was constructively redeemed.

The stock received by the employees was subject to the restrictions imposed by the ANC Plan, including the vesting provisions. In contrast, this same stock in Schneider's hands, which the electing bonus recipients allegedly purchased directly from him, was subject to the Buy–Sell Agreement, not the ANC Plan. Paragraph 2 of the Buy–Sell Agreement set forth ANC's right of first refusal and provided that "[i]f stock of [ANC] is sold under the terms of [paragraph 2] to a person other than [ANC], such shares shall be free of all further restrictions hereunder." Because ANC had waived its right of first refusal with respect to the stock Schneider sold to the employees, absent other agreements, the employees' stock should not have been subject to any restrictions.

Schneider contended at oral argument that the ANC Plan restrictions were a condition of his offer to sell the class B stock. Although we have not been directed to any documentary evidence of this assertion in the record, if this were so, then ANC was merely the third-party beneficiary of the sales agreement between Schneider and the electing employees. ANC's actions belie such a status. In later years ANC modified the restrictions in the ANC Plan, in particular relaxing some of the vesting provisions applicable to employees over 55 years of age. Schneider's counsel conceded at oral argument that it did so without obtaining the express consent of either Schneider or the employees. A third-party beneficiary, however, cannot modify a contract between Schneider and individual employees without their express consent. Transport acted as if it were a principal to the contract, not a third-party beneficiary.

Transport was in fact a party to the key agreement. The ANC plan restrictions were imposed on the employee's stock as a condition set forth in the Undertaking and Agreement executed by the employee. The agreement was between the employee and the corporation; Schneider was not a party. It provided in part that "in consideration of the receipt of stock under the American National Stock Ownership Plan ... the employee agrees to all restrictions and undertakes all the obligations set forth in the Plan."[7] The Undertaking and Agreement

---

7. The Tax Court found that both the employer and the employees considered the stock itself to be compensation. Employees who received a bonus were required to fill out the Undertaking and Agreement which provided in part that the employee was electing to receive ANC class B common stock "as additional compensation" and that "this stock and all future stock received as additional compensation is subject to certain restrictions." It does not say, as one would expect under the hypothesized position, that the employee has been awarded cash as compensation and notify the employee of an opportunity to buy stock from Schneider. The Tax Court's position is further corroborated by a resolution adopted at the March 12, 1974 Board of Directors meeting which provided that ANC would waive its right of first refusal with respect to "its

also accounts for the corporation's ability to unilaterally amend the plan, providing that "[t]he Employee agrees that the Plan may be amended and interpreted in the future by the Board of Directors of the corporation and that he will abide by all such amendments and interpretations." Thus, contrary to Schneider's position at oral argument, the ANC Plan restrictions were applicable because of an agreement executed between the corporation and the bonus recipient.[8] Under these facts and circumstances, we hold that the shares received by the employees were obtained directly from Transport.

Once it is determined that the bonus recipients received their stock from Transport, the rest of the pieces fall into place. In order to administer the ANC Plan, Transport needed to acquire the necessary ANC stock. ANC was the most obvious source, but it was reluctant to issue new stock because of the dilution and cash build-up effects. Both problems were solved by having ANC obtain the stock from Schneider. There was no dilution because the stock was previously outstanding. In addition, ANC suffered no cash build-up because the funds Transport paid to it were used to satisfy the obligations to Schneider it incurred to acquire his stock. ANC's acquisition of Schneider's stock, however, is a redemption under § 317 of the Internal Revenue Code. The decision of the Tax Court is AFFIRMED.[9]

---

shares of class B stock which [Schneider] is furnishing to fulfill the requirements of the [ANC] Plan for *additional compensation.*" Transport, not Schneider, pays compensation to Transport employees; stock received as compensation would therefore have come directly from Transport.

8. Because Schneider's position is that the ANC Plan restrictions were applicable because they were a condition of his sale, we need not address the argument that Transport had required these restrictions to apply as a condition for "arranging" the sale with Schneider.

9. The parties also contest the applicability of § 83 of the Internal Revenue Code and in particular Treasury Regulation § 1.83–6(d)(1). The Tax Court did not reach this issue. Because we affirm the Tax Court's finding of constructive redemptions, we also do not reach the issue of the application of § 83 to this case.