ESTATE OF JAMES J. DURKIN, SR., DECEASED, JAMES J. DURKIN, JR., PERSONAL REPRESENTATIVE, AND ANNA JEAN DURKIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 47036-86.     Filed November 18, 1992.

*Thomas W. Ostrander, Mark E. Cedrone,* and *Joshua Sarner,* for petitioners.

*Linda S. Bednarz* and *Ruth Spadaro,* for respondent.

COLVIN, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax of $75,293 for 1973, $244,229 for 1974, $4,234,380 for 1975, $124,345 for 1976, $72,325 for 1977, and $95,160 for 1978.

Following concessions, a conditional settlement of various issues, and our opinion in *Estate of Durkin v. Commissioner,* T.C. Memo. 1992-325, the sole remaining issue for decision is whether petitioners' bargain purchase of culm banks on June 26, 1975, resulted in a constructive dividend to petitioners. We hold that it did.

In *Estate of Durkin v. Commissioner, supra,* filed June 8, 1992, we decided that the fair market value of culm banks acquired by petitioners on June 26, 1975, was $7.25 million, and that petitioner Anna Jean Durkin is not an innocent spouse under section 6013(e). A culm bank is a refuse pile produced as a byproduct of anthracite coal mining. Culm banks are sometimes reprocessed to produce additional coal. *Estate of Durkin v. Commissioner, supra.*

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. All facts found in *Estate of Durkin v. Commissioner, supra,* are incorporated herein by reference. The following facts are restated for the reader's convenience.

## 1. *Petitioners*

James J. Durkin, Sr., and Anna Jean Durkin (petitioners) resided in Dallas, Pennsylvania, when the petition was filed. James J. Durkin, Sr., died on June 30, 1989. James J. Durkin, Jr., and Edward E. Durkin are petitioners' sons. References to the Durkins are to petitioners and their sons.

## 2. *The Entities*

Raymond Colliery Co., Inc. (Raymond Colliery), owned all the stock of Blue Coal Corp. (Blue Coal) and Olyphant Premium Anthracite, Inc. (Olyphant), as of April 1973. Petitioners purchased Blue Coal, Raymond Colliery, Olyphant, and various subsidiaries in November 1973 through a holding company called the Great American Coal Co. (GACC).

James Riddle Hoffa (Hoffa), the former general president of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters), and James J. Durkin, Sr., sought a $13 million loan from the Teamsters' Central States, Southeast, and Southwest Areas Pension Fund (Central States Pension Fund) and the Mellon Bank to finance the stock purchase. The loan was not made.

Hoffa brought Hyman Green (Green), a wealthy entrepreneur, into the transaction. Green sought a loan from Institutional Investors Trust (IIT), which gave GACC a commitment for a loan of about $8.5 million.

Fifty percent of the stock of GACC was issued to Green and 50 percent was issued to petitioners. Between November 1973 and June 26, 1975, petitioners each owned 25 shares of the stock of GACC constituting 50 percent of the total authorized outstanding shares. Green owned the other 50 shares. Hoffa, Green, and James Durkin, Sr., had an understanding under which GACC stock ownership would be 50 percent for Hoffa, 40 percent for petitioners, and 10 percent for Green. However, the stock was not transferred because of restrictions imposed by IIT.

James J. Durkin, Sr., was president and assistant treasurer, and Anna Jean Durkin was secretary and treasurer of GACC from April 13, 1973, to June 26, 1975. By July 15, 1974, Green was chairman of the board. James C.B. Millard, Jr. (Millard), Green's attorney, was executive vice president.

James J. Durkin, Sr., was a director of Raymond Colliery and president, assistant secretary, and a director of Blue Coal. Anna Jean Durkin was secretary and a director of Raymond Colliery; vice president, secretary, treasurer, and a director of Blue Coal; and secretary of Olyphant. Petitioners received substantial salaries from Blue Coal between November 1973 and June 26, 1975.

James J. Durkin, Sr., became president of Blue Coal after GACC acquired Blue Coal. James J. Durkin, Jr., was Blue Coal's vice president. Green initially had little involvement in Blue Coal's operations.

Frank Dougher, the comptroller for Blue Coal; Gene Zafft, Hoffa's attorney; Charles Parente, the accountant for petitioners and their businesses; and Anna Jean Durkin were not aware of any animosity between James J. Durkin, Sr., and Hoffa.

3. *The June 26, 1975, Transactions: Petitioners' Purchase of Culm Banks From GACC and Sale of GACC Stock to Green*

a. *Overview*

On June 26, 1975, petitioners purchased the Blue Coal culm banks from GACC and sold their GACC stock to Green. Petitioners also agreed to terminate their employment with Blue Coal. Green negotiated the transactions over a period of several months with James J. Durkin, Jr., who acted on behalf of petitioners. The transactions ended petitioners' ownership of GACC stock and transferred coal properties from GACC to petitioners.

Petitioners (through James J. Durkin, Jr.) and Green both exercised control over the transactions. The parties consulted with attorneys and accountants and attempted various structures before arriving at the final form. Tax effects were considered during the negotiations.

b. *Sale of Blue Coal Culm Banks to the Durkins and the Durkins' GACC Stock to Green*

Early in 1975, James J. Durkin, Jr., began negotiating with Green to buy the Blue Coal culm banks. Green sought to buy the Durkins' stock in Blue Coal on February 27, 1975, for $1.205 million and to have the Durkins resign their posi-

tions as officers and directors of GACC and its subsidiaries. On May 28, 1975, petitioners agreed to purchase certain culm banks' access easements and a breaker site from Blue Coal, Raymond Colliery, and Olyphant for $2.97 million and a 1-dollar-per-ton royalty. Also, on May 28, 1975, petitioners and Millard (acting in his capacity as GACC's executive vice president) signed an agreement that petitioners' culm bank purchase would be conditioned on the fact that, at the time of closing, neither petitioner would own or have an option to purchase any GACC stock. The May 28, 1975, purchase agreement was superseded by a June 26, 1975, agreement (the culm agreement), and modified on January 28, 1976.

In the June 26, 1975, agreement, petitioners purchased the culm banks in issue. The purchase price of the assets sold under the June 26, 1975, agreement was $4.17 million and a 1-dollar-per-ton royalty. The $4.17 million consideration was composed of:

| | |
|---|---:|
| Certified check | $254,000 |
| Promissory note | 400,000 |
| Cancellation of indebtedness by the Durkins | 2,333,920 |
| Assumption of GACC debts by the Durkins | 610,000 |
| Promissory note from petitioners, cosigned by their sons | 572,080 |
| | 4,170,000 |

On June 26, 1975, the board of directors of Blue Coal adopted a resolution to convey parcels of land and the culm material to petitioners. Petitioners, Green, and Millard were the members of the board of directors of Blue Coal who authorized the resolution.

### c. *Sale of Petitioners' GACC Stock to Green*

On June 26, 1975, petitioners entered into an agreement to sell their GACC stock to Green for $205,000, to cancel all indebtedness owed to them from GACC, and to resign as officers, directors, and employees of GACC and its subsidiaries. On June 26, 1975, petitioners resigned as officers of GACC and its subsidiaries. On their 1975 Federal income tax return, petitioners reported that they sold their GACC stock and reported their basis in the GACC stock to be $205,000, thus resulting in no gain or loss on the stock sale. They also reported that they purchased the culm banks, and that the

purchase was conditioned on the fact that, at the time of closing, petitioners would own no capital stock or options to buy capital stock in GACC.

In *Estate of Durkin v. Commissioner,* T.C. Memo. 1992-325, we found that the fair market value of the culm banks was $7.25 million on June 26, 1975.

OPINION

The issue for decision is whether petitioners received a constructive dividend as a result of their bargain purchase of culm banks from GACC on June 26, 1975. Petitioners argue that their June 26, 1975, culm bank purchase and stock sale to Green should be taxed as if it had been structured as a redemption, citing *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954). Respondent argues that in *Zenz* the taxpayer consistently sought to have the transaction taxed based on its form, unlike petitioners here, who disavow the form they chose, and that a taxpayer's ability to disavow the form it has chosen for a transaction is circumscribed, especially in the U.S. Court of Appeals for the Third Circuit, to which this case is appealable. *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967), revg. 44 T.C. 549 (1965). We agree with respondent.

1. *Essential Nature of Petitioners' Culm Bank Purchase and GACC Stock Sale Transaction*

Petitioners and Green negotiated at arm's length to terminate petitioners' interest in GACC. Petitioners argue that they lacked the ability to control this transaction because of animosity between Mr. Durkin and Green. We disagree. We do not believe that the claimed animosity kept petitioners and Green from jointly controlling these transactions. They distributed GACC's culm banks under terms intended to further their mutual advantage. Petitioners purchased the culm banks for less than fair market value on the same day that Green purchased petitioners' GACC stock for $205,000. Petitioners and Green chose a form for the transactions intended to avoid Federal income taxation of the sale of their GACC stock to Green by separately agreeing to that sale at a price equal to petitioners' basis in the stock, and understating the value of the culm banks.[1]

---

[1] For analyses of bootstrap transactions, see generally Bittker & Eustice, Federal Income Tax-

## 2. *Statutory Background*

Sections 301(b)(1) and (c)(1) and 316(a) generally provide that the fair market value of property distributed by a corporation out of earnings and profits for the taxable year to a stockholder is a dividend to the extent it exceeds the amount paid for the property.

The Code provides exceptions to dividend treatment of certain stock redemptions. If a corporation redeems its stock, the redemption is not treated as a dividend if it is not essentially equivalent to a dividend, or if it is in complete termination of a shareholder's interest in a corporation. Sec. 302(b)(1), (3). Section 302(a) and (b)(1) and (3) provides as follows:

SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.
(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
(b) REDEMPTIONS TREATED AS EXCHANGES.—
(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

\*   \*   \*   \*   \*   \*   \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

Under section 317(b), stock is generally treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property.

## 3. *Tax Treatment of Transactions Structured by Taxpayers as a Redemption*

Petitioners assert that their purchase of the culm banks and their sale of GACC stock to Green was in substance one integrated transaction in which they disposed of all of their stock, and which should be taxed as if petitioners had structured it as a redemption. Further, petitioners argue that "the real abuse" of the tax laws in this case is that Green, not

---

ation of Corporations and Shareholders, par. 9.07 (5th ed. 1987); Jassy, "The Tax Treatment of Bootstrap Stock Acquisitions: The Redemption Route vs. the Dividend Route", 87 Harv. L. Rev. 1459 (1974); Kingson, "The Deep Structure of Taxation: Dividend Distributions", 85 Yale L.J. 861 (1976); Lang, "Dividends Essentially Equivalent to Redemptions: The Taxation of Bootstrap Stock Acquisitions", 41 Tax L. Rev. 309 (1986).

petitioners, received a constructive dividend, and that "he, not petitioners, should pay any resultant tax consequences".

Petitioners cite *Zenz v. Quinlivan, supra,* for the proposition that this transaction should be treated as a redemption of petitioners' interest, which, under section 302(b)(3), is taxable as a sale or exchange of their interest in GACC. In *Zenz,* the sole shareholder sought to sell her stock to a competitor. The buyer purchased part of the stock for cash. Three weeks later the corporation redeemed the taxpayer's remaining stock. The taxpayer, in her tax return, reported the transaction as a complete redemption by the corporation in termination of her interest in the corporation and therefore not a dividend. *Zenz v. Quinlivan, supra* at 916.

The Commissioner contended that the redemption was essentially equivalent to a dividend. The Commissioner argued that a dividend would have resulted if the redemption had preceded the stock sale, and that the taxpayer should not be allowed to avoid dividend treatment by arranging for the stock sale to precede the redemption. The Sixth Circuit recognized that the taxpayer had structured the transaction to avoid taxes, but stated that the question was not whether the taxpayer avoided taxes that would have been incurred if the taxpayer had chosen a different form. *Zenz v. Quinlivan, supra* at 917. The Court noted, *id.,* that a taxpayer has the right to decrease the amount of what otherwise would be owing by means which the law permits. *Gregory v. Helvering,* 293 U.S. 465, 469 (1935). Instead, the Court of Appeals stated that the issue is whether the sale was a taxable dividend or the sale of a capital asset. In *Zenz v. Quinlivan, supra* at 917,[2] the court concluded:

> where the taxpayer effects a redemption which completely extinguishes the taxpayer's interest in the corporation, and does not retain any beneficial interest whatever, that such transaction is not the equivalent of the distribution of a taxable dividend to him. *Tiffany v. Commissioner,* 16 T.C. 1443 [1951].

The instant case is fundamentally different from *Zenz v. Quinlivan, supra.* The taxpayer in *Zenz* structured the transaction as a redemption that completely terminated her

---

[2] The sequence of the redemption and the stock sale is irrelevant so long as both events are clearly part of an overall plan to eliminate the shareholder's interest in the corporation. *United States v. Carey,* 289 F.2d 531 (8th Cir. 1961).

interest, reported it as a redemption of all her stock on her income tax return, and consistently sought to have it treated as a redemption. *Zenz v. Quinlivan, supra* at 916. In contrast, petitioners did not structure or report the transactions as a redemption. In a redemption, the corporation acquires its stock from a shareholder for property. Sec. 317(b). Instead, petitioners sold their GACC stock to Green for $205,000 (the amount of their basis), and purchased culm banks worth $7,250,000 (as we decided in *Estate of Durkin v. Commissioner,* T.C. Memo. 1992-325) for $4,170,000. They chose this form after informed negotiations which considered tax effects. Their object was to structure the sale and purchase to be totally free of Federal income tax, including capital gains tax that would result if they had patterned the deal after *Zenz v. Quinlivan, supra,* by using a redemption. But their plan failed. Their concealed bargain sale was revealed, and respondent determined petitioners received a constructive dividend. As a result, after having first tried to avoid the result in *Zenz v. Quinlivan, supra,* petitioners now rely on *Zenz.* We disagree that this reliance is justified. The taxpayer in *Zenz* sought to give effect to her treatment of the transaction, while petitioners here seek to disavow their treatment of the transaction.

*Zenz v. Quinlivan, supra,* does not control here for the same reason that *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978), was not controlling in *Bradley v. United States,* 730 F.2d 718 (11th Cir. 1984). In *Bradley,* the court barred the taxpayer from disavowing the form of a transaction. The taxpayer had cited *Frank Lyon Co. v. United States, supra,* in which the Supreme Court rejected the Commissioner's attempt to disregard the form adopted by the taxpayer. The court in *Bradley* distinguished *Frank Lyon Co.* on grounds also applicable here:

> *Frank Lyon* is readily distinguishable from the present case. Unlike taxpayers in this case, the taxpayer in *Frank Lyon* did not seek to abandon its own agreement to obtain tax relief based upon the underlying economic substance of the transaction. The factual setting of *Frank Lyon* and this case are strikingly dissimilar and, therefore, inapposite. Accordingly, *Frank Lyon,* does not support taxpayers' argument and does not invalidate the former Fifth Circuit's ruling in *Spector* [*v. Commissioner,* 641 F.2d 376, 381 (5th Cir. 1981)].

*Bradley v. United States, supra* at 720.

Petitioners also rely on *McDonald v. Commissioner,* 52 T.C. 82 (1969), in which we held that the step transaction doctrine was applicable in deciding whether a redemption was essentially equivalent to a dividend under section 302(b)(1). However, that case is no more apt than *Zenz v. Quinlivan, supra.* The taxpayer in *McDonald* structured a transaction as a redemption and reported it as a redemption on his income tax return. He treated it as a redemption during the litigation of his case. We held that, as in *Zenz,* the transaction may be taxed in the form chosen by the taxpayer. See also *Clark v. Commissioner,* 86 T.C. 138, 151-152 (1986), affd. 828 F.2d 221 (4th Cir. 1987), affd. 489 U.S. 726 (1989).

Section 302(b)(3) provides that a redemption is not treated like a dividend if it is in complete termination of a shareholder's interest in a corporation. Petitioners acknowledge that there was no redemption of GACC stock in the instant case. Accordingly, petitioners fail to meet the terms of section 302(b)(3). The Supreme Court has stated that

> although a court may have reference to * * * [the statutory] purpose when there is a genuine question as to the meaning of one of the requirements Congress has imposed, a court is not free to disregard [statutory] requirements simply because it considers them redundant or unsuited to achieving the general purpose in a particular case. * * * [*Commissioner v. Gordon,* 391 U.S. 83, 93 (1968).]

Petitioners assert, however, that the sale of their GACC stock to Green and their purchase of the culm banks should be treated as a complete redemption because they are interrelated transactions which resulted in termination of their interest in GACC. They argue that "The redemption was not specifically couched in terms 'redemption' since there was an agreement between Mr. & Mrs. Durkin and Green for the sale of the Durkin stock to Green for $205,000." We disagree with that assessment. Instead, we believe petitioners chose to avoid a redemption to conceal their bargain sale. We have previously rejected a taxpayer's argument that a transaction should be treated like a redemption where no redemption occurred or was contemplated. *Reitz v. Commissioner,* 61 T.C. 443 (1974), affd. without published opinion 507 F.2d 1279 (5th Cir. 1975) (taxpayer donated all the stock of a corporation to a local Government immediately after corporation declared a dividend for the taxpayer). In *Reitz* we said:

Perhaps petitioners could have fashioned the transaction as a sale, a redemption and gift, or a liquidation and gift. Instead they arranged a dividend followed by a gift. Of course, petitioners were entitled to choose the most favorable arrangement. But having chosen the method they did for accomplishing their goals, petitioners are bound by their choice. * * * [*Reitz v. Commissioner, supra* at 449; citations omitted.]

## 4. *Disavowal of Form by Taxpayers*

Petitioners seek to disavow the form of this transaction, and to have it recognized for its substance. The Commissioner may look through the form of a transaction to its substance, *Gregory v. Helvering,* 293 U.S. 465 (1935), and bind a taxpayer to the form in which the taxpayer has cast a transaction. *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149 (1974); *Bradley v. United States, supra; Hamlin Trust v. Commissioner,* 209 F.2d 761 (10th Cir. 1954), affg. 19 T.C. 718 (1953). In contrast, "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." *Bolger v. Commissioner,* 59 T.C. 760, 767 n.4 (1973).[3]

In *Commissioner v. National Alfalfa Dehydrating & Milling Co., supra* at 149, the Supreme Court said:

This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, *Higgins v. Smith,* 308 U.S. 473, 477 (1940); *Old Mission Portland Cement Co. v. Helvering,* 293 U.S. 289, 293 (1934); *Gregory v. Helvering,* 293 U.S. 465, 469 (1935), and may not enjoy the benefit of some other route he might have chosen to follow but did not. "To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty." [Citations omitted.]

*Gray v. Powell,* 314 U.S. 402, 414 (1941); *Higgins v. Smith,* 308 U.S. 473, 477 (1940); *Hamlin Trust v. Commissioner, supra.* Similarly, "It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less." *Television Industries, Inc. v. Commissioner,* 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959).

---

[3] See generally Smith, "Substance and Form: A Taxpayer's Right to Assert the Priority of Substance", 44 Tax Law. 137 (1990).

A taxpayer is required to recognize his own corporation, *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943), even if the corporation has insufficient economic substance to be recognized for tax purposes. *Strick Corp. v. United States,* 714 F.2d 1194, 1206 (3d Cir. 1983).

The rule binding taxpayers to the form of their transaction is not an absolute; in several situations taxpayers have been permitted to escape taxation based on their own conscious agreements. See *Bartels v. Birmingham,* 332 U.S. 126 (1947); *Helvering v. F. & R. Lazarus & Co.,* 308 U.S. 252 (1939). In *Commissioner v. Danielson,* 378 F.2d at 778, the court said:

> In *Helvering v. F. & R. Lazarus & Co.,* * * * the Supreme Court noted that one who must "bear the burden of exhaustion of capital investment" is entitled to a deduction for depreciation regardless of the fact that the taxpayer by agreement designated another as the legal owner. Similarly, in *Bartels v. Birmingham,* * * * the Supreme Court stated that "in the application of social legislation" such as the Social Security Act, "it is the total situation that controls" liability for employment taxes regardless of the fact that the taxpayer by agreement designated itself as the employer.
>
> In contrast, in the present situation there is no discernible policy which would require that the incidence of taxation fall upon a particular individual. As a result of the circumstances that an amount allocable to a covenant not to compete is amortizable by the buyer and ordinary income to the seller, it generally does not matter what amount is allocated. And where a loss of tax revenues from one taxpayer cannot be retrieved entirely from another because of differentials in tax brackets or other factors the Commissioner may challenge the allocation as not reflecting the substance of the transaction.
>
> [Citations omitted.]

In *Estate of Weinert v. Commissioner,* 294 F.2d 750, 755 (5th Cir. 1961), revg. and remanding 31 T.C. 918 (1959), the court said:

> Resort to substance is not a right reserved for the Commissioner's exclusive benefit, to use or not to use—depending on the amount of the tax to be realized. The taxpayer too has a right to assert the priority of substance—at least in a case where his tax reporting and actions show an honest and consistent respect for the substance of a transaction. * * *

In this Court, a taxpayer generally may not disavow contract allocations in covenants not to compete without "strong proof" that the agreed allocation does not reflect reality. *Sonnleitner v. Commissioner,* 598 F.2d 464, 467-469 (5th Cir. 1979), affg. in part, revg. in part and remanding T.C. Memo. 1976-249 (taxpayer failed to provide strong proof that a cov-

enant not to compete was devoid of economic realty or entered into under economic duress); *Dixie Finance Co. v. United States,* 474 F.2d 501, 505 (5th Cir. 1973), affg. *Stewart v. Commissioner,* T.C. Memo. 1971-114 (taxpayer met strong proof standard; Government had taken inconsistent positions in separate proceedings below involving both of the taxpayers, and prevailed in both); *Barran v. Commissioner,* 334 F.2d 58, 64 (5th Cir. 1964), affg. in part, revg. in part and remanding 39 T.C. 515 (1962) (taxpayer failed to meet strong proof standard); *Ullman v. Commissioner,* 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957) (sellers failed to meet strong proof standard). We have reached a similar result in a step transaction context. *Glacier State Electric Supply Co. v. Commissioner,* 80 T.C. 1047, 1054-1058 (1983) (taxpayer not allowed to invoke step transaction doctrine to disavow form of transaction). The strong proof requirement does not apply to the Commissioner. *Empire Mortgage & Investment Co. v. Commissioner,* T.C. Memo. 1971-270, affd. sub nom. *Dixie Finance Co. v. United States,* 474 F.2d 501, 505 (5th Cir. 1973).

In the Third Circuit, to which this case is appealable, and in certain other circuits, taxpayers may disavow an allocation to a covenant not to compete only with evidence that would allow reformation of the agreement in an action with the other party to the transaction. *Bradley v. United States,* 730 F.2d 718 (11th Cir. 1984); *Spector v. Commissioner,* 641 F.2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979); *Connery v. United States,* 460 F.2d 1130, 1134 (3d Cir. 1972); *Commissioner v. Danielson, supra; Coleman v. Commissioner,* 87 T.C. 178, 201-204 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987).

In *Commissioner v. Danielson, supra,* the taxpayers allocated amounts to sellers' covenants not to compete. The taxpayers reported the amounts received as derived from the sale of capital assets. The Commissioner disallowed capital treatment for the amounts allocated to covenants not to compete. The court said:

the Commissioner here is attempting to hold a party to his agreement unless that party can show in effect that it is not truly the agreement of the parties. And to allow the Commissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have

it within their own control to choose in the first place whatever arrangements they care to make.

\*   \*   \*   \*   \*   \*   \*

For these reasons we adopt the following rule of law: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. \* \* \* [*Commissioner v. Danielson, supra* at 775.]

The Third Circuit has also applied the *Danielson* rule to bar a taxpayer from disavowing the allocation of a sales price to leases. *Sullivan v. United States,* 618 F.2d 1001, 1007-1008 (3d Cir. 1980).

Petitioners have not produced evidence that would be admissible in an action involving Green to alter the construction of their agreement, or to show its unenforceability because of mistake, fraud, undue influence, etc., and therefore, under *Danielson,* may not disavow the form of their culm bank purchase and GACC stock sale.

It is clear that both the *Danielson* and the strong proof rules apply beyond cases involving allocation of payments to a covenant not to compete. *Bradley v. United States, supra; Spector v. Commissioner, supra; Sullivan v. United States, supra* at 1007; *Coleman v. Commissioner, supra* at 202; *Miami Purchasing Service Corp. v. Commissioner,* 76 T.C. 818, 830 (1981) (where title did pass from taxpayer to buyer); *Stephens v. Commissioner,* 60 T.C. 1004 (1973), affd. without opinion 506 F.2d 1400 (6th Cir. 1974) (whether taxpayers were legally obligated to buy stock).

Under either the *Danielson* rule or the strong proof standard, these petitioners should not be allowed to disavow the form they chose. First, petitioners seek to disavow their own tax return treatment for the transaction. *Illinois Power Co. v. Commissioner,* 87 T.C. 1417, 1429-1430 (1986); *Glacier State Electric Supply Co. v. Commissioner, supra* at 1058; *Legg v. Commissioner,* 57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974). Second, their tax reporting and actions do not show "an honest and consistent respect for the substance of \* \* \* [the] transaction." See *Estate of Weinert v. Commissioner,* 294 F.2d at 755. Instead, the prices chosen by petitioners were an attempt to eliminate petitioners from GACC at a price and in a form designed to

conceal the value of the culm banks. Third, petitioners are unilaterally attempting to have the transaction treated as a redemption after it has been challenged. *Glacier State Electric Supply Co. v. Commissioner, supra* at 1058; *Hoover Co. v. Commissioner,* 72 T.C. 206, 248 (1979); *Legg v. Commissioner, supra.* In fact, petitioners first contended that the transaction should be treated as a redemption, and first relied on *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954), in 1991, 15 years after the transaction at issue. Fourth, it would unjustly enrich petitioners to permit them to belatedly change the deal made after well-informed negotiations with Green. *Spector v. Commissioner, supra* at 385.

A party disavowing the form of a transaction may be unjustly enriched, particularly where the party was acting on tax advice, because the price may be influenced by tax considerations. *Danielson v. Commissioner,* 378 F.2d at 775. If a party disavows the form of a transaction, the Commissioner may be whipsawed between one party claiming taxation based on the form, and the opposite party claiming taxation based on the substance. *Comdisco, Inc. v. United States,* 756 F.2d 569, 578 (7th Cir. 1985). Petitioners' argument on brief that the dividend concealed by their transactions is Green's, not theirs, illustrates the risk posed to tax administration if a party might unilaterally disavow the form chosen after a negotiation.

In considering whether the Commissioner is whipsawed, we need not consider whether in fact the Commissioner is barred from obtaining consistent treatment. See *Coleman v. Commissioner,* 87 T.C. at 203 (no whipsaw because one taxpayer was in the United Kingdom).

Respondent's challenge to the pricing of petitioners' culm bank purchase does not open the door for petitioners to disavow the form of the transaction. E.g., *Juden v. Commissioner,* 865 F.2d 960 (8th Cir. 1989) (taxpayer was not permitted to disavow his transaction in a case where the Commissioner successfully challenged the value of property included in the transaction), affg. T.C. Memo. 1987-302. To hold otherwise would at a minimum be an untoward invitation to the kind of mispricing and concealment that petitioners attempted here. It is petitioners, not respondent, that seek to recharacterize their 1975 culm bank purchase and stock sale. Respondent's determination accepts the form cho-

sen by petitioners. Respondent determined that petitioners mispriced the culm banks, but a valuation dispute is not a recharacterization. A bargain purchase of property by a shareholder is a constructive distribution. *Honigman v. Commissioner,* 55 T.C. 1067, 1077 (1971), affd. in part, revd. in part and remanded 466 F.2d 69 (6th Cir. 1972); *Epstein v. Commissioner,* 53 T.C. 459, 474-475 (1969); sec. 1.301-1(j), Income Tax Regs. The distribution is a dividend if made from the corporation's earnings and profits accumulated after February 28, 1913, or during the taxable year. Sec. 316(a). Dividends normally are taxed as ordinary income unless some specific exception or qualification applies. *Commissioner v. Gordon,* 391 U.S. 83, 89-90 (1968).

Petitioners do not argue that the distribution was not made from earnings and profits, and they do not argue that the income resulting from the bargain sale itself is entitled to taxation as long-term capital gain. Instead, they argue that their culm bank purchase and stock sale should be recharacterized as a redemption. Thus it is petitioners, not respondent, that seek to recharacterize the transaction.

Petitioner states that the doctrine enunciated in *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954), derives from the step transaction doctrine. However, this is not an appropriate case to permit the taxpayer to invoke the step transaction doctrine. In *Penrod v. Commissioner,* 88 T.C. 1415, 1428-1430 (1987), we summarized the step transaction doctrine as follows:

The step transaction doctrine is in effect another rule of substance over form; it treats a series of formally separate "steps" as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result.

\* \* \* \* \* \* \*

There is no universally accepted test as to when and how the step transaction doctrine should be applied to a given set of facts. Courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular situation.

The narrowest alternative is the "binding commitment" test, under which a series of transactions are collapsed if, at the time the first step is entered into, there was a binding commitment to undertake the later step.

\* \* \* \* \* \* \*

At the other extreme, the most far-reaching alternative is the "end result" test. Under this test, the step transaction doctrine will be invoked if it appears that a series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result.

\* \* \* \* \* \* \*

The third test is the "interdependence" test, which focuses on whether "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." \* \* \*

None of these tests is met here. The binding commitment test is not met because there was no binding commitment to redeem petitioner's GACC stock at the time of their bargain purchase and stock sale. The end result test is not met because a redemption was not the end result of the transaction. The interdependency test is not met because a redemption was not done, much less made an interdependent part of the transaction.

Petitioner invokes the step transaction doctrine in an effort to synthesize a redemption of GACC stock. Petitioner takes this position 15 years after the transaction at issue because section 302(b)(3) requires a redemption, and here they avoided use of a redemption. Petitioner is in effect arguing that since capital gains would apply if they had cast it in another form—a redemption—we should grant similar treatment to the form they used. This we cannot do. *Glacier State Electric Supply Co. v. Commissioner*, 80 T.C. 1047, 1054-1058 (1983).

Although we agree with petitioner that where appropriate, under the step transaction doctrine, separate steps must be taken together in attaching tax consequences, this is not a correct case in which to apply that doctrine. Petitioner is not asking us to skip, collapse, or rearrange the steps he employed. \* \* \* He is instead asking that we accept an entirely new series of steps or events that did not take place. The step transaction doctrine cannot be stretched so far. [*Id.*, citation omitted.]

In light of the foregoing, we reject petitioners' contention that any gain should be treated as if there had been a redemption of their GACC stock.

### 5. *Ownership of GACC Stock*

Petitioners assert that they owned only 40 percent of the GACC stock, that Hoffa owned 50 percent, and Green owned

10 percent, and argue that therefore they could not have had control. We recognize that another Federal court has found that petitioners owned 40 percent of the GACC stock. *United States v. Gleneagles Investment Co.*, 565 F. Supp. 556, 566 (M.D. Pa. 1983), affd. in part and vacated in part sub nom. *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986). However, on our record, we are not convinced that petitioners' ownership changed from 50 percent before June 26, 1975. Petitioners and Green certified to IIT that petitioners and Green owned 50 percent each. At most they gave Hoffa an opportunity to buy 50 percent of the stock of GACC. Hoffa did not do so, however, because of restrictions imposed by IIT. Even if we had found that petitioners owned only 40 percent of the stock of GACC, we would still find that petitioners and Green negotiated together to structure petitioners' culm bank purchase and stock sale to their mutual advantage. See, e.g., *Green v. United States*, 460 F.2d 412 (5th Cir. 1972). In *Green*, the taxpayer owned 7.90571 percent of the outstanding corporate stock. Petitioners' ownership of 50 percent of the outstanding stock (even with an option to sell 10 percent of their stock to Hoffa or Green), their positions as officers, directors, and employees of the corporation, the arm's-length negotiations with the other shareholder, the structure of the transactions as separate transactions with the stock sale for exactly petitioners' basis in the stock, and the culm banks' sale for less than fair market value show that they exercised substantial influence over GACC.

We sustain respondent's determination as modified by our finding of fair market value in *Estate of Durkin v. Commissioner*, T.C. Memo. 1992-325, and hold that petitioners received a constructive dividend to the extent that the purchase price of the culm banks was less than fair market value.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

HAMBLEN, COHEN, JACOBS, GERBER, WRIGHT, PARR, WELLS, and RUWE, *JJ.*, agree with the majority opinion.

SWIFT, *J.,* concurs in the result only.

CHIECHI, *J.,* dissents.

---

HAMBLEN, *C.J.,* concurring: I agree with the majority opinion refusing to impute a redemption under the circumstances presented. In my view, the disputed transaction, and the surrounding circumstances, are readily distinguishable from *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954).

We should confine our analysis of the Durkins' tax liability to the specific facts presented, not to what petitioner might otherwise have done. *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148-149 (1974). As articulated in *National Alfalfa,* we should be reluctant to: (1) Reject the established tax principle that a transaction is to be given its tax effect in accord with what actually occurred not in accord with what might have occurred, and (2) speculate about what might have happened at the time of the transaction had it not been structured as it was. *Id.* at 148. "This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not". *Id.* at 149; see also *Haley Bros. Construction Corp. v. Commissioner,* 87 T.C. 498, 513 (1986); *Groetzinger v. Commissioner,* 87 T.C. 533, 541 (1986).

The Durkins did not structure or report the transaction as a redemption. To hold that it was a *Zenz* type transaction could encourage attempts to manipulate bootstrap buyout transactions after the fact and countenance post-transaction tax planning. As suggested in *National Alfalfa,* careful and forthright tax planning of such transactions should be accomplished before they are carried out, not afterwards.

COHEN, JACOBS, WRIGHT, PARR, and WELLS, *JJ.,* agree with this concurring opinion.

---

CHABOT, *J.,* concurring in the result: To the extent that the majority forbid petitioners to argue substance over form, I disagree.

I would hold that petitioners are bound by the facts they helped to create (i.e., the course of action they pursued), but I would permit petitioners to contend that the substance of the transactions is different from the forms they used, and thus to dispute the tax characterization of what occurred.[1] However, I would then hold that petitioners have failed to show that their income is properly taxable as a capital gain rather than a dividend. This is the same result that the majority reach, and so I concur in their result but do not join in their opinion.

Three different ways have been suggested to characterize the facts of the instant case: (1) A constructive dividend to petitioners of the excess value of the culm banks, (2) a constructive dividend to Green of the excess value of the culm banks, Green then using the excess value as part of the purchase price for petitioners' GACC stock, and (3) a redemption by GACC of petitioners' stock, using the excess value of the culm banks as the consideration. The question before us is whether petitioners have proven that the first alternative is not the proper characterization of the facts.

It is suggested that because petitioners terminated their interest in GACC before GACC transferred the culm banks to petitioners, the distribution of the excess value could not have been a constructive dividend to petitioners because the distribution was not "to a shareholder with respect to its stock", sec. 301(a). However, legal ownership of stock at the time of the distribution is not necessarily a requirement for dividend income. See sec. 1.61-9(c), Income Tax Regs. ("When a stock is sold after the declaration of a dividend and after the date as of which the seller becomes entitled to the dividend, the dividend ordinarily is income to the seller"); 10 Mertens, Law of Federal Income Taxation, sec. 38B.18, at 75

---

[1] The distinction was recently described as follows by Judge Raum in n.3 of his opinion in *Kanetzke v. Commissioner,* T.C. Memo. 1991-152:

The Government has attempted to associate with *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967), the Supreme Court's statement in *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149 (1974), to the effect that "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not [citations omitted], and may not enjoy the benefit of some other route he might have chosen to follow but did not." Although this statement might teasingly appear to be related to *Danielson,* it was in fact directed to an entirely different matter. The issue in *Nat. Alfalfa* was whether the taxpayer there would be treated as having pursued a course of action different from the one it had in fact followed. By contrast, the issue here involves the proper characterization of the course of action actually followed by petitioner. We in no way intend to depart from *Nat. Alfalfa,* but we find it inapplicable here.

(1991) ("If the stock is sold after both the date the dividend was declared and the record date (when the owner becomes entitled to the dividend), the dividend will be includable in income of the seller"); *id.* sec. 38B.19, at 76 ("When a stock is trading exdividend, the seller is entitled to a dividend that has already been declared but not yet paid"). Thus, the timing of the contractual termination of petitioners' interest in GACC and the distribution of the excess value does not preclude a finding of a constructive dividend to petitioners.

As the majority point out, majority op. p. 570, petitioners concede that in fact there was no redemption of their GACC stock. As to the substance, in contrast to *Estate of Schneider v. Commissioner,* 88 T.C. 906, 939-941 (1987), affd. 855 F.2d 435 (7th Cir. 1988), (1) it does not appear in the instant case that the stock that Green received was different from the stock that petitioners disposed of, and (2) petitioners and Green did negotiate a transfer of GACC stock from petitioners to Green. Thus, the elements that caused us to conclude that the *Estate of Schneider* situation provided a better fit for a redemption, in the instant case cause me to conclude that the situation here provides a poor fit for a redemption, but a proper fit for a sale and a constructive dividend to petitioners.

As to the theory of a constructive dividend of the culm banks to Green followed by a transfer from Green to petitioners, we note that there is no evidence that Green ever had even momentary legal or equitable ownership of the culm banks. The dividend-to-Green theory requires the creation of events which never in fact occurred. The step transaction doctrine suggested by petitioners involves the determination that a series of transactions be treated as an integrated transaction, not that steps which never occurred be treated as though they occurred. This analysis of the step transaction doctrine is explained in *Glacier State Electric Supply Co. v. Commissioner,* 80 T.C. 1047, 1057-1058 (1983), as follows:

> Although we agree with petitioner that where appropriate, under the step transaction doctrine, separate steps must be taken together in attaching tax consequences, this is not a correct case in which to apply that doctrine. Petitioner is not asking us to skip, collapse, or rearrange the steps he employed. See *Harris v. Commissioner,* 61 T.C. 770, 783 (1974). He is instead asking that we accept an entirely new series of steps or events

that did not take place. The step transaction doctrine cannot be stretched so far.

Despite petitioner's present objections, in essence it is merely arguing that since the transaction would have been nontaxable if cast in another form, we should grant similar treatment to the form it utilized. This we cannot do.

The cornerstone of tax planning is that the same economic or business result may be validly achieved through a variety of routes, each with differing tax consequences. The step transaction doctrine may be argued by taxpayers in cases where the form chosen does not reflect that transaction's true substance (which is reflected in the combining of the individual steps). This is to be distinguished, however, from situations where, as in the instant case, the substance of the transaction coincides with the form employed. In such situations, it is well-settled that:

while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not. [*Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149 (1974); citations omitted.]

This Court also views with disfavor attempts by taxpayers to restructure transactions after they are challenged. *Hoover Co. v. Commissioner,* 72 T.C. 206, 248 (1979); *Legg v. Commissioner,* 57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974); *Acro Manufacturing Co. v. Commissioner,* 39 T.C. 377, 385 (1962), affd. 334 F.2d 40 (6th Cir. 1964), cert. denied 379 U.S. 887 (1964).

Accordingly, we conclude that in both form and substance, the two redemptions occurred here as they were originally cast, and that the step transaction doctrine is of no aid to petitioner.

Thus, the step transaction doctrine does not permit us to create a step in which Green had a legal or equitable right to the culm banks. Accordingly, I conclude that the instant case provides a poor fit for a constructive dividend to Green.

In the instant case, the conclusion that petitioners received a constructive dividend matches the facts as we have found them at least as well as either of the two above-described alternatives and, on balance, is a better "fit" to the facts. The substance of petitioners' transaction, and our characterization of it, is in accord with petitioners' course of action, and the form of a constructive dividend. At the very least, I would conclude that petitioners failed to carry their burden of proving that either of the other two alternatives better characterize the facts. Thus, I concur in the majority's result.

However, the majority reach their result by refusing to consider the merits of petitioners' central claims.[2] That is, the majority conclude that "these petitioners should not be allowed to disavow the form they chose." (Majority op. p. 574.)

In the past we have not feared to listen to taxpayers' claims. We have allowed taxpayers to argue that the substance of what they did should control over the form they used, and in many instances then concluded that the substance indeed matched the form.

In *Glacier State Electric Supply Co. v. Commissioner,* 80 T.C. at 1053-1054, we described our approach as follows:

> We agree with petitioner that it is the substance of a transaction rather than mere form which should determine the resultant tax consequences when the form does not coincide with economic reality. *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945); *Higgins v. Smith,* 308 U.S. 473 (1940); *Foster v. Commissioner,* 80 T.C. 34, 201 (1983); *Gray v. Commissioner,* 56 T.C. 1032 (1971). The taxpayer, as well as the Commissioner, is entitled to assert the substance-over-form argument although in such situations taxpayers may face a higher than usual burden of proof. *Landa v. Commissioner,* 206 F.2d 431, 432 (D.C. Cir. 1953); *Ciaio v. Commissioner,* 47 T.C. 447, 457 (1967).

The majority refer to *Glacier State* at several points in justifying their determination to forbid petitioners to invoke the doctrine of substance over form. With respect, I suggest the majority miss the point of *Glacier State.* As the above quotation from *Glacier State* plainly states, taxpayers are allowed to invoke the doctrine of substance over form. When the taxpayer in *Glacier State* invoked the step transaction doctrine, we pointed out that it was misusing the doctrine. We there said: "Petitioner is not asking us to skip, collapse, or rearrange the steps * * * [it] is instead asking that we accept an entirely new series of steps or events that did not take place." 80 T.C. at 1057-1058. Thus, the lesson of *Glacier State* is that we bind taxpayers to the *facts* they helped to create, even though we permit them to invoke the substance-over-form doctrine. In *Glacier State,* we analyzed the substance and facts, and closed as follows: "Accordingly, we con-

---

[2] It is not clear whether the majority's analysis is a version of, or analogous to, the various forms of the doctrine of judicial estoppel discussed in *Bokum v. Commissioner,* 94 T.C. 126, 135-137 (1990), on appeal (11th Cir., July 31, 1990).

clude that in both form and substance, the two redemptions occurred here as they were originally cast". 80 T.C. at 1058.

That is the analysis I would use in the instant case.

We have used this analysis in Court-reviewed opinions, without challenge.

In *Yamamoto v. Commissioner,* 73 T.C. 946, 954 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982), a Court-reviewed opinion, we explained as follows:

Apart from any question of presumption of correctness of respondent's determination, we will assume that the acts of the parties and documentation surrounding the transactions reflect the intent of the parties unless we are given some evidence to the contrary. We will not relieve a party from the tax consequences of the form in which he or she appears to have molded a transaction, *in the absence of proof that that form does not properly reflect the transaction.* [Emphasis added.]

We then examined the taxpayers' contentions and concluded that "petitioners have wholly failed to persuade us that Yamamoto's books and records, as well as those of the corporations, were in complete conflict with the true intentions of the parties to the transactions". 73 T.C. at 958.

In *Hope v. Commissioner,* 55 T.C. 1020, 1031 (1971), affd. 471 F.2d 738 (3d Cir. 1973), also a Court-reviewed opinion, we stated as follows:

While we agree with the petitioner's observation that the substance of a transaction must prevail over its form (*Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945)), and that the rule may work for the benefit of the taxpayer as well as the Government (*Frank Ciaio,* 47 T.C. 447 (1967)); *Maynard Hospital, Inc.,* 52 T.C. 1006 (1969), we do not find that the realities of the transactions that are the subject of the instant case differ from the form in which they were cast.

*Abrams v. United States,* 797 F.2d 100 (2d Cir. 1986), involved a dispute as to whether a payment by a decedent was a gift in contemplation of death. Decedent and her husband had filed joint income tax returns. The Internal Revenue Service determined that decedent and her husband owed additional income taxes. Decedent's husband borrowed from a bank and paid the income taxes. During the next year, decedent's husband paid off part of the loan. Decedent then paid off another part of her husband's loan. Decedent's executrix contended that decedent's payment of a part of decedent's husband's loan should be considered as, in sub-

stance, a payment of a portion of decedent's joint and several income tax liability. The Court of Appeals did not prohibit decedent's executrix from challenging the form of decedent's payment. Rather, the Court of Appeals set forth the text that we have quoted from *Yamamoto v. Commissioner, supra,* and then concluded that the evidence in the case was insufficient to create a genuine issue as to whether the substance was different from the form.

In sum, I would permit petitioners to make their contentions and I conclude that respondent's analysis better fits the facts (or, at least, that petitioners have failed to carry their burden of proving that respondent's analysis is wrong). I disagree with the majority's denial of petitioners' right to make their contentions.

Because my ultimate conclusion in the instant case is the same as the majority's, I concur in the result even though I do not join in the majority's opinion.

GERBER, *J.,* agrees with this concurring opinion.

---

HALPERN, *J.,* dissenting: Although I fully join in Judge Beghe's dissent, I write separately to emphasize my astonishment at the result reached by the majority and to provide an abbreviated critique for those without the appetite for Judge Beghe's seven-course analysis.

Consider the following example: X Corp. is a successful, closely held corporation, whose outstanding stock consists of 100 shares, each worth $1x, held equally by A and B, unrelated individuals. A decides that she has had enough of the corporate world and wishes to dispose of her shares and move to Florida. B wants to continue with X Corp. A offers her shares to B, but B has insufficient funds to buy them. There is, however, $40x in the X Corp. treasury, and B can obtain $10x. To accomplish a buyout of A, it is agreed that, sequentially, on the same day, (1) X Corp. will distribute $40x to A and (2) B will then purchase A's 50 shares for $10x. Not being advised by tax counsel, A, B, and X Corp. characterize the distribution of $40x from X Corp. to A as a dividend. A's tax preparer, however, is wiser, and treats the whole $50x received by A as a payment in exchange for her stock. I am certain that, notwithstanding what the parties

called the distribution from X Corp., this Court should treat the transaction as reported by A's tax preparer. See *Smith v. Commissioner,* 82 T.C. 705 (1984); *Roth v. Commissioner,* T.C. Memo. 1983-651. I do not think that result would change if, in addition to the facts stated, A, at the same time, purchased an asset from X Corp. at a fair market value price. In essence, that latter case is the case at hand, except that, in the case at hand, the "dividend" was achieved by way of a bargain purchase from the corporation. I fail to see how the tax result for the case at hand can be any different than for the hypotheticals here presented. Accordingly, I believe the majority is wrong.

WHALEN and BEGHE, *JJ.,* agree with this dissent.

------

BEGHE, *J.,* dissenting: Even if what I think is the majority's overly severe approach to this case [1] is confined to its peculiar facts, the majority opinion can only add more confusion and uncertainty to the already tangled tax jurisprudence of bootstrap acquisitions.

I respectfully dissent from the majority opinion, and submit that the majority have jumped, by way of assumption and assertion, without adequate analysis, to their conclusion that the $3.08 million distribution was a dividend to petitioners, rather than partial payment in exchange for petitioners' GACC stock. [2] Nor does Judge Chabot's concurrence provide a

------

[1] In light of the substantial consideration paid by petitioners for the culm bank assets ($4.17 million plus $1 per ton royalty, increased by $1.2 million from the agreement signed the month before), and the $1 million reduction in the ostensible purchase price for their GACC stock, as compared with the buyer's original offer, I agree with Judge Chabot that we should not just disregard petitioners' arguments. The majority's objurgations on petitioners' misconduct in structuring the transaction and failing to report the distribution that the Court has found should not prevent us from analyzing the facts in the record and properly applying the law in order to arrive at the correct characterization of that distribution.

[2] The commentators cited by the majority would either agree that the result reached by the majority is mistaken, or that more analysis is required. See majority op. note 1.

Bittker and Eustice, without reaching any normative conclusions, describe the three formats into which a bootstrap transaction can be cast by the parties, and observe that "Not surprisingly, the Service seeks to fit ambiguous transactions into whatever pattern will produce the most revenue, while taxpayers seek to fit them into the least costly form." Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.07, at 9-35 (5th ed. 1987).

Jassy concludes that even if a distribution labeled "dividend" is paid to a selling shareholder and is not treated as a constructive dividend to the purchaser or continuing shareholder, then it should have capital gain consequences to the seller, provided one of the requirements of sec. 302(b), such as the complete termination of the stock interest of the selling shareholder, is met. Jassy, "The Tax Treatment of Bootstrap Stock Acquisitions: The Redemption Route vs. the Dividend Route", 87 Harv. L. Rev. 1459, 1479-1483 (1974).

Kingson observes that corporate distributions in bootstrap acquisitions have no independent

satisfactory path to the majority's conclusion. Although his concurrence embarks on a more coherent justification for the majority's conclusion, it also begs the question, and falls short of its goal.

For the purpose of this exercise, I accept Judge Colvin's findings of fact as set forth at length in *Estate of Durkin v. Commissioner,* T.C. Memo. 1992-325, particularly part 7 thereof, "The June 26, 1975 Transactions: Petitioners' Purchase of Culm Banks from GACC and Sale of GACC Stock to Green", and as restated and augmented in the preface to the majority opinion. Although I have some reservations about Judge Colvin's finding that the culm bank transaction was mispriced,[3] the dispositive evaluation of that finding is best left to the U.S. Court of Appeals for the Third Circuit, to which this case will be appealable.

The majority hold that, inasmuch as petitioners paid substantially less than a fair market value for the culm banks that they acquired from GACC, they received a constructive dividend to the extent the true value of the culm banks exceeded the amount they paid GACC, determined in *Estate of Durkin v. Commissioner, supra,* to be $3.08 million. This holding is erroneous. The $3.08 million excess value of the culm banks received by petitioners in their transactions with Green and GACC was a payment in exchange for their GACC stock, received either on the sale of their GACC stock to Green or on a constructive redemption of the bulk of their GACC stock. Because the tax result to petitioners is the same under either of these alternatives, $3.08 million of long-term capital gain, the Court need not choose between them. *Smith*

---

economic substance outside of tax consequences and therefore should be characterized by reference to what he calls "negotiation substance". "If the negotiations are consistent with the form of the distribution and sale carried out by the parties, that form should determine the tax consequences [of the distribution]." Kingson, "The Deep Structure of Taxation: Dividend Distributions", 85 Yale L. J. 861, 866-867, 883-884 (1976).

Lang, building on the review of the cases and rulings by Jassy and Kingson, does not attempt to reconcile or justify the diverse results of the cases and rulings, but instead analyzes and evaluates the current state of the law. Lang concludes that "Institutional considerations and fundamental tax considerations suggest that all acquisitions should be treated for tax purposes as if carried out by redemption of a portion of the seller's stock in combination with a sale of the seller's remaining stock to the purchaser." Lang, "Dividends Essentially Equivalent to Redemptions: The Taxation of Bootstrap Stock Acquisitions", 41 Tax L. Rev. 309, 381 (1986).

[3] Without expressing disagreement with the Court's findings in *Estate of Durkin v. Commissioner,* T.C. Memo. 1992-325, on the value of the culm banks as of June 26, 1975, I do point out that petitioners and their coventurers and licensees appear to have encountered heavy losses in their attempts to exploit the culm banks in subsequent years.

*v. Commissioner,* 82 T.C. 705, 717-718 (1984), discussed *infra* pp. 595-597, 598-599, 602, 604.[4]

Part I of this dissent attempts to clear away the underbrush in two areas: To draw attention to the points in the majority opinion with which I agree, and to point out the various ways in which the cases relied upon by the majority have little or nothing to do with the case. Part II deals with this case by showing why the excess value of the culm banks received by petitioners was additional payment in exchange for their GACC stock, rather than a constructive dividend to them.

## I.

I agree with the following points at the beginning and end, respectively, of the majority opinion: The presence or absence of animosity between petitioners and Green has no bearing on how this case should be decided; it is clear that petitioners and Green jointly controlled the form, structure, and end results of the transaction. Following Mr. Kingson's approach, the question is what was the "negotiation substance" of the transaction,[5] insofar as it bears on how the Court should characterize the distribution exposed by respondent. Also, the question of whether petitioners actually owned 40 percent or 50 percent of the GACC stock does not bear on the outcome. The only issue for decision is whether the value of the distribution by GACC should be considered part of the consideration received by petitioners on their disposition of GACC stock,[6] or whether it should be treated as a constructive dividend to them.

The majority opinion characterizes the issue in this case as whether petitioners will be allowed to disavow the form of their transaction, citing *National Alfalfa Dehydrating & Milling Co. v. Commissioner,* 417 U.S. 134, 149 (1974). Majority op. pp. 570-571. That is not the issue. Rather, because respondent and the Court have exposed the undervaluation that the parties to the agreements had not disclosed, the further task of the Court is to determine its

---

[4] Indeed, in refusing to follow and apply the Division opinion in *Smith v. Commissioner,* 82 T.C. 705 (1984), the Court is sub silentio overruling it. I suggest that the preferable course, if *Smith* is not to be followed, would be for the Court expressly to overrule it.

[5] See Kingson, *supra* at 883-884.

[6] There seems to be no dispute about petitioners' basis for their GACC stock, irrespective of whether it represented a 40- or 50-percent interest in GACC.

character for tax purposes, insofar as petitioners are concerned.

The majority have not fairly characterized what petitioners represented the form of the transaction to be. Petitioners did not at any time assert that there was a distribution. What they asserted, in response to respondent's determination, is that there was no distribution, an issue no longer before the Court at this stage of the proceedings. What the majority is doing is putting words in petitioners' mouths and then binding them to those words.

In any event, *National Alfalfa* does no more than stand for an "actual transaction" principle,[7] that the taxpayer is not entitled to recast a transaction into steps that were not actually taken. Petitioners have not asked this Court to speculate on the treatment of steps they did not take. Rather they ask us to characterize a newly identified distribution on the basis of the steps they actually took. Thus, *National Alfalfa* does not prevent the Court from performing its task, to determine the character in petitioners' hands of the additional value they received in the culm bank leg of the overall transaction.

Moreover, petitioners are not asking the Court to violate the actual transaction principle of *National Alfalfa,* as applied in *Glacier State Electric Supply Co. v. Commissioner,* 80 T.C. 1047 (1983), and impute additional steps that were not actually taken. The majority and concurring opinions fail to recognize that the Court can hold petitioners to the form of their transaction, without imputing any additional steps, and still properly conclude that the newly discovered element, i.e., the $3.08 million excess value of the culm banks, was an amount received by petitioners as payment in exchange for their stock, not a dividend.

The majority also rely on the Third Circuit's decision and opinion in *Commissioner v. Danielson,* 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), for the proposition that petitioners "may not disavow the form of their culm bank purchase and GACC stock sale." Majority op. pp. 573-575. The *Danielson* rule does not prevent the Court from determining the character of the undervaluation. Petitioners disclosed on Rider D-6 to their 1975 return the

---

[7] See Smith, "Substance and Form: A Taxpayer's Right to Assert the Priority of Substance", 44 Tax Law. 137, 141 (1990).

interdependence of the culm bank transaction and the disposition of their GACC stock. The May 28, 1975, letter agreement between petitioners and GACC demonstrates that the culm bank agreement and the GACC stock purchase agreement were each incomplete without the other; the culm bank agreement was not legally binding and could not have gone forward without the consummation of the stock purchase agreement. Because each of the agreements, standing alone, is incomplete, the Pennsylvania parol evidence rule does not apply. See *Mellon Bank Corp. v. First Union Real Estate,* 951 F.2d 1399, 1405 (3d Cir. 1991); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir. 1980); *Murray v. Univ. Pa. Hosp.,* 490 A.2d 839, 844 (Pa. Super. 1985); see also 3 Corbin on Contracts, secs. 581-582, at 440-464 (1960 & Supp. 1989); 2 Farnsworth, Contracts, sec. 7.3, at 470 (1990). The Third Circuit's *Danielson* rule is therefore inapplicable because the Pennsylvania parol evidence rule does not preclude the Court from looking to extrinsic evidence in construing the two agreements and reading them together. The Court should also consider all relevant testimony and evidence regarding the negotiations leading up to the two agreements and the relationship between the agreements in order to determine the true character of the excess value received by petitioners.

Another school of red herring that swim through the majority opinion and the Chief Judge's concurrence are the repeated references to *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954), and the characterization of petitioners' position as an attempt to take advantage of *Zenz* by having the Court in this case treat the transaction as a redemption. The Court need not rely on or extend *Zenz* in order to reach the correct result. *Zenz* cannot be relied upon to impute a redemption; in *Zenz* there was an actual redemption.

*Reitz v. Commissioner,* 61 T.C. 443 (1974), affd. without published opinion 507 F.2d 1279 (5th Cir. 1975), is also inapposite. Our decision in *Reitz* does not preclude us from holding that the transaction here in issue resulted in a constructive redemption of part of petitioners' stock. The taxpayers in *Reitz* were the sole shareholders of a corporation, and caused it to declare a dividend to them equal to all its liquid assets before donating all their stock in the corporation to a local government agency. Although the distribution was a declared

dividend, and labeled and referred to as such in all contemporaneous documentation, the taxpayers tried to have it treated for tax purposes as payment by the local government agency for their stock. There was no binding contract of sale between the taxpayers and the government agency when the dividend was declared or paid. Thus, the Court concluded that the distribution was a dividend in both form and substance. By contrast, in the case before us, there was a binding contract between petitioners and Green, a preexisting shareholder, for the sale of their stock, the two transactions happened on the same day, and no dividend was declared.

Judge Wisdom's rule in *Estate of Weinert v. Commissioner,* 294 F.2d 750, 755 (5th Cir. 1961), revg. and remanding 31 T.C. 918 (1959), that a taxpayer cannot disavow the form of his transaction and assert that substance should control if he did not report the substance of the transaction in a manner consistent with the position taken before the Court, does not apply here. Petitioners' primary position at trial was that there was no excess value. Inasmuch as the Court has rejected petitioners' position in that respect, petitioners should be free to argue the substance of the distribution that the Court has found.

The majority take the view that *Estate of Weinert* requires that petitioners be left with the worst case characterization and separation of the stock sale and culm bank transaction for the five reasons set forth at pages 574-575 of the majority opinion.[8] These reasons are not compelling.

First, as to petitioners' supposed disavowal of their tax return treatment of the transaction. The Court need not allow petitioners to disavow the form of their transaction, nor have petitioners attempted to do so here. Petitioners having disclosed on their 1975 return the interdependence of the two legs of the transaction, and the Court having so found, the Court should mush on and determine the character of the excess consideration that it has also found, which the agreements did not expressly provide for, much less allocate either to Green or to petitioners. In so doing, the Court would not be allowing petitioners to disavow their form, but assuming its proper responsibility to characterize the excess value of the culm banks received by petitioners.

---

[8] Gleaned from the somewhat longer list in Smith, *supra* at 144-147.

The same is true of the second proposition, that petitioners did not show an honest and consistent respect for the substance of the transaction. The Court's duty, in these circumstances, is to make the characterization and allocation that the parties to the transaction failed to do, so that the tax result is consistent with tax reality.

Third, the majority state that petitioners are now trying to treat the transaction as a redemption. That is not what petitioners are doing; they are trying to have the $3.08 million in excess value of the culm banks treated as part payment in exchange for their stock. As shown above, there are two alternative characterizations of the distribution, only one of which is a redemption, but either would result in capital gain treatment to petitioners.

Fourth, the majority state that petitioners would be unjustly enriched to permit them to change the deal after well-informed negotiations with Green. However, it is respondent and the Court who have changed the deal. There is a characterization of the transaction that would not have had any adverse effect on Green: a direct redemption of the bulk of petitioners' stock by GACC. Green, under this approach, would not be charged with a dividend and he would still end up, as he actually did, as the sole shareholder of GACC.

In any event, this whole issue is speculative and academic. Green is dead, the period of limitations has in all likelihood expired against him and his estate for the tax year 1975, and we have no way, on the record before us, of knowing what tax treatment he actually received.

It beggars description to say that petitioners would be unjustly enriched by permitting them to belatedly change the deal after well-informed negotiations with Green. On the contrary, it is petitioners who will be even more greatly impoverished than Green's estate by the Court's endorsement of respondent's determination that petitioners received a substantial distribution, and by the majority's treatment of this distribution as a dividend to petitioners.[9] The deal as

---

[9] The result of the majority's holding is that petitioners will have a tax liability on this transaction, computed at the top marginal rate for 1975, on the order of $2.17 million which, with interest, will currently amount to more than $12 million. The tax liability on the capital gain would be on the order of $1.08 million, which, with interest, would currently exceed $6 million. The Schedule D to petitioners' 1975 income tax return shows a net long-term capital loss of $1,032,050, chiefly attributable to the claimed worthlessness of securities of "Pocono Downs". If

structured resulted in Green's, for a payment of only $205,000, increasing from 50 percent to 100 percent his stake in GACC, a corporation that had a net worth in excess of $3 million as a result of what petitioners paid it for the culm banks (not to speak of any other assets that remained in GACC after the culm banks and related assets had been distributed).

The majority's fifth reason for leaving petitioners with the more costly alternative is that the Commissioner will be whipsawed.[10] There is often a potential for whipsaw when there is a transaction between parties who have opposing tax interests, but the correct decision in this case does not require a whipsaw result either in favor of or against the Commissioner: "Every schoolboy knows" that a properly planned and executed bootstrap transaction does not result in dividend treatment of either the terminating or remaining shareholder. See *State Pipe & Nipple Corp. v. Commissioner,* T.C. Memo. 1983-338.

Where, as here, the Court finds an element in the transaction that the parties have denied, the Court should determine the character of the element and make the allocation, without regard to whether the parties tried to maximize their mutual tax advantage. Instead, the majority completely disregard the objection, by the party before the Court, to the Commissioner's characterization of the transaction. Consistent with Judge Tannenwald's approach in *Coleman v. Commissioner,* 87 T.C. 178, 203 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987), we could treat the transaction as if both Green or his estate and petitioners were before the Court, and determine the recipient of the distribution in the light of respondent's argument that petitioners, rather than Green, should be considered the recipient. If that is the result, then the distribution should be considered to have been received by petitioners in partial redemption of

this claimed loss is allowable, petitioners' net long-term capital gains tax and interest liability resulting from sale or exchange treatment would be reduced, but there would still be a substantial liability for tax and interest. Since enactment of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, the distinction between long-term capital gain and ordinary income has been of less moment, with a rate differential for individuals currently amounting to only 3 percent. Sec. 1(h), I.R.C. 1992. See Faber, "Capital Gains v. Dividends in Corporate Transactions: Is the Battle Still Worth Fighting?", 64 Taxes 865 (1986). In this case we are talking about a 35-percent rate differential and a substantive difference in dollars.

[10] See Gilbert & Mather, "Whipsaw Revisited", 43 Tax Law. 343 (1990), defining whipsaw as arising in a tax transaction when two taxpayers have a claim to the same tax benefit.

their stock. As Judge Fay concluded in *Roth v. Commissioner,* T.C. Memo. 1983-651, discussed *infra* pp. 597-599, where the terminating shareholder received a corporate distribution as an incident of the transaction, the distribution was received in redemption of his stock, even though the parties had labeled it a dividend.

Contrary to the assertions of the majority, majority op. pp. 576-577, all the requirements for a step transaction were satisfied. *Penrod v. Commissioner,* 88 T.C. 1415, 1429-1430 (1987). On June 26, 1975, petitioners' stock interests in GACC were terminated, and they have received a substantial corporate distribution (the amount by which the fair market value of the culm banks exceeded the consideration paid GACC) in simultaneous mutually binding interdependent transactions. The end result of these transactions is that, in one day, petitioners' stock interests in GACC were completely terminated, as were all their other interests, as directors, officers, employees, and creditors, in GACC and its subsidiaries. In these circumstances, all amounts that petitioners received in these transactions, irrespective of whether their source was Green or GACC, look to me more like a payment in exchange for petitioners' stock than a dividend to them. But that is the question the Court should address, and to that question I now turn.

## II.

Respondent, by finding that the culm banks were undervalued, uncovered the distribution. However, that distribution is, at best, ambiguous in character. Thus, the Court should not just agree with respondent's determination that the distribution was a constructive dividend to petitioners. Rather, the Court should pay closer attention than the majority to the negotiations that led up to the June 26, 1975, transactions. Those negotiations reflected petitioners' desire to acquire the culm banks as well as Green's desire to acquire a 100-percent interest in GACC. Back in February 1975, Green had offered $1.205 million for petitioners' stock. The negotiations eventuated in the letter agreement of May 28, 1975, in which petitioners and GACC agreed that the culm bank purchase would be conditioned on petitioners' not owning any stock in GACC and their same-day agreement on the

price petitioners would pay for the culm banks. Majority op. pp. 564-565. In the month that followed, the parties' further negotiations culminated in the June 26, 1975, culm bank agreement, with a price for the culm banks and related assets paid by petitioners that exceeded the previously agreed-upon price by $1.2 million, while the price Green ostensibly paid for petitioners' GACC stock was $1 million less than his initial offer 4 months previously.

The GACC distribution cannot be a dividend to petitioners because the culm bank agreement and stock purchase agreement, as supplemented by the May 28, 1975, letter agreement and other evidence in the record, clearly provided that the culm bank agreement would not close unless petitioners had given up all their GACC stock and all other interests in GACC. Therefore, the $3.08 million corporate distribution was either a constructive dividend to Green, the sole remaining shareholder, which he indirectly used as additional consideration to pay petitioners for giving up their stock, or it was a direct distribution to petitioners. If it was a direct distribution to petitioners, it cannot be a dividend to them because it was part of the consideration for their termination of all their legal and beneficial interests in GACC. Therefore, such direct distribution to petitioners from GACC must have been received by them in constructive redemption of the bulk of their GACC stock.

This Court has not hesitated to determine the reality of a transaction and find that payments labeled "compensation" or "dividend" were actually redemption distributions to shareholders whose interests in the corporation were being terminated. In *Smith v. Commissioner,* 82 T.C. 705, 717-718 (1984), the agreement in question provided for amounts to be paid to the taxpayer, who was disposing of all his stock in the corporation, that were allocated between stock "purchase price" paid by the remaining shareholders and "commissions due" that were paid by the corporation. In suggesting that a part sale and part redemption had occurred, the Court showed no concern for whether any stock certificates or shares had been transferred to the redeeming company:

If the corporation paid more than it was obligated to, it would appear that Progress was partially redeeming petitioner's shares. Under this scenario, the transaction would not be a straight purchase by Schmitt and Benton

as indicated by the terms of the original agreement.[11] Thus further ambiguity surrounds who is the buyer of petitioner's stock in Progress.

[11] The issue of whether Schmitt and Benton are actual purchasers of petitioner's stock or whether the corporation is redeeming petitioner's shares was not presented to us by the parties for decision.
[*Smith v. Commissioner, supra* at 715.]

The *Smith* case is instructive on another account. Because the taxpayer was a Pennsylvania resident, the case was appealable to the Third Circuit, and the *Danielson* rule would have applied, but the Court found the *Danielson* rule inapplicable because the agreement was ambiguous. The Court therefore felt free, by resort to extrinsic evidence, to resolve the ambiguity of whether the corporate payment to the selling shareholder was commissions (as it had been labeled), taxable as ordinary income, or a payment in exchange for his stock, taxable as long-term capital gain.

Relying on expert testimony in the record, the Court found that the $8,500 purchase price recited in the stock purchase agreement was incredibly low, that the value of the taxpayer's stock was approximately $25,000, and that the taxpayer had no preexisting right to commissions as such. Even though the corporation and its shareholders had been improperly treating yearend corporate payments to them as deductible commissions, thereby zeroing out the corporate tax, the Court did not treat the so-labeled final corporate payments to the terminating shareholders as commission payments, but rather as payments in exchange for their stock.

The Court's peroration is instructive and right on point. It concludes, as I suggest, that it is not necessary to choose between the alternative characterizations of total stock sale versus part stock sale/part redemption:

Based upon the entire record in this case, we think the $24,974 amount the parties agree that petitioner received was for the purchase and sale of his stock interest in Progress. The terms of the agreement thus reveal that the buyers intended to use the corporation's income as a means to finance a portion of the purchase price of petitioner's stock. Essentially, the agreement was used as a financing tool. In this manner, the transaction took the form of a part sale and part redemption (see secs. 302(b)(3), 317(b)), or else a total sale to Schmitt and Benton using Progress as their agent (see *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954)). In either event, petitioner is entitled to capital gains treatment for the $14,974

amount (the excess of his amount realized over his basis in the stock). Sec. 1001. [*Id.* at 717-718; fn. refs. omitted.]

The analysis of then Chief Judge Dawson in *Smith* makes clear that the Court can find a redemption for tax purposes without finding that shares or share certificates were transferred to the corporation. This approach is consistent with the Court's holding in *Fowler Hosiery Co. v. Commissioner,* 36 T.C. 201 (1961), affd. 301 F.2d 394 (7th Cir. 1962), that no actual surrender of stock by the shareholder is required in order to have a redemption, if the actual surrender of stock would be a mere formality.[11]

Another case taking a similar approach to *Smith v. Commissioner, supra,* is *Roth v. Commissioner,* T.C. Memo. 1983-651. Here, Judge Fay held that although a cash distribution from a corporation to one of its two individual shareholders was structured as a dividend, and labeled as such, the recipient was entitled to capital gain treatment. This was because application of the step transaction doctrine established that the distribution was in substance a redemption that, with other transactions, divested the recipient of his entire interest in the corporation. Judge Fay stated:

Clearly, the "step transaction" doctrine is applicable in the instant case. Petitioner's sale of his Roth Boneless Beef stock to Roth Investment Company, the redemption of his remaining stock in that corporation by Roth Boneless Beef, the redemption by Roth Investment Company, and the cash distribution from Roth Boneless Beef, were contractually interdependent transactions which took place simultaneously. Moreover, the clear purpose of the transactions—to divest petitioner of his entire interest in the corporations and effectively give William sole ownership—could not have been accomplished in the absence of any one of these steps. Accordingly, we conclude that these integrated transactions must be viewed together for purposes of determining whether the cash distribution was, in substance, a dividend.

---

[11] See Jassy, *supra* at 1480-1481. The Commissioner has agreed with the approach taken in *Fowler Hosiery Co. v. Commissioner,* 36 T.C. 201 (1961), affd. 301 F.2d 394 (7th Cir. 1962), and extended it in three revenue rulings. Rev. Rul. 90-13, 1990-1 C.B. 65; Rev. Rul. 81-3, 1981-1 C.B. 125; Rev. Rul. 79-257, 1979-2 C.B. 136. In these rulings, the Commissioner concluded that where there is only one shareholder, or where the distribution of corporate assets is pro rata, a surrender of stock is a meaningless gesture; after the transaction, the shareholder's interest in the corporation remains unchanged, regardless of whether he actually surrenders his stock to the corporation. In such circumstances, the shareholder is "deemed to have constructively surrendered that number of shares the total fair market value of which equals the amount of the distribution. The requirement of a redemption may be deemed satisfied by these constructive exchanges." Rev. Rul. 81-3, 1981-1 C.B. at 125-126.

Viewing the cash distribution in the context of these interrelated transactions, we fail to see how it can be characterized as a dividend. To constitute a dividend, a payment must be made to a shareholder in his capacity as a shareholder. Sec. 1.301-1(c), Income Tax Regs. The integrated transactions in the instant case left no room for such a payment. Simultaneous with the cash distribution, petitioner's interest in the corporations was in all respects completely terminated. Under such circumstances, we do not think it is logical to view the cash distribution as having been paid to petitioner in his capacity as a shareholder since, upon receiving the payment, he was from that point on no longer a shareholder. See *United States v. Carey* 289 F.2d 531, 538 (8th Cir. 1961). Accordingly, we conclude that the cash distribution represented nothing more than a payment in connection with the termination of petitioner's stock interest rather than a dividend. That Roth Boneless Beef made no similar distribution to William, who was also a 50 percent stockholder in the corporation, certainly lends support to this conclusion. [*Roth v. Commissioner, supra;* fn. ref. and citation omitted.]

Judge Fay went on to deal with the Commissioner's additional argument that addressed a problem similar to one in the case before us, the disparity per share of the payments received from two different sources by the selling shareholder:

Respondent argues in the alternative that if the cash distribution is treated as part of the redemption price for petitioner's stock, then Roth Boneless Beef redeemed 844 shares for $206,089.50, or $244.18 per share, far in excess of the $53.33 per share paid by Roth Investment Company for the 14,156 shares it acquired. On that basis, respondent contends petitioner must still be treated as having received a "constructive" dividend to the extent Roth Boneless Beef paid him more than the fair market value for the 844 shares. We, however, reject this argument because we do not view these transactions in the same manner as respondent.

As discussed, the redemption of 844 shares by Roth Boneless Beef and the sale of 14,156 shares to Roth Investment Company must be viewed together, not as independent transactions. In that light, it is obvious that the cash distribution was received not only in consideration for the 844 shares redeemed by Roth Boneless Beef but also as additional consideration for the 14,156 shares simultaneously acquired by Roth Investment Company. Petitioner disposed of his entire interest in Roth Boneless Beef pursuant to a series of interrelated transactions and, when the "dust settled," he had $961,089.50 to show for it. Significantly, this amount is consistent with the price at which petitioner originally agreed to sell these same shares to William pursuant to the July 7, 1976, "Offer and Acceptance" agreement. That Roth Boneless Beef paid him $206,089.50 and redeemed only 844 shares ($244.18 per share), and a related corporation paid him $755,000.00 and acquired 14,156 shares (53.33 per share), was of no economic consequence to petitioner. Viewing the transactions together, petitioner received $961,089.50 for his 15,000 shares of stock in

Roth Boneless Beef, or $64.07 per share. Under the circumstances of this case, we conclude that he should be taxed on that basis. [*Roth v. Commissioner, supra,* fn. refs. omitted.]

This aspect of the case before us reinforces the applicabililty here of the approaches of Judges Dawson and Fay in the *Smith* and *Roth* cases—the obvious disproportion between the ostensible purchase price of the stock— $205,000—and the net amount of the distribution—$3.08 million—that the majority and concurring opinions treat as a dividend. It does not make sense to conclude that petitioners sold their 50-percent stock interest to Green for $205,000, in the light of Green's prior offer to purchase it for $1.205 million, while they were simultaneously receiving a gross distribution in excess of $7 million, even as they were also transferring back cash and other assets to GACC that left it with net worth of at least $3.17 million,[12] plus the net value of any other assets remaining in GACC and its subsidiaries.

Finally, there is another aspect of the transaction that makes redemption treatment, including the application of *Fowler Hosiery Co. v. Commissioner, supra,* especially appropriate. The sale-distribution in question consisted of the assets of a going business, not only the culm banks, but also the related assets that would be needed to exploit them. As a result, partial liquidation treatment under section 302(b)(4) would be appropriate. Although petitioners have not made this argument, its obvious applicability reinforces the conclusion that ordinary dividend treatment to petitioners is improper.

Judge Chabot, applying the presumption of correctness to respondent's determination that the excess value portion of the culm banks was a dividend distribution to petitioners, concludes that petitioners did not carry their burden of persuading the Court that the excess value of the property distributed to them was an additional payment in exchange for their stock.

In an attempt to show that the $3.08 million in excess value of the culm banks could have been a dividend distribution to petitioners, even if they had no beneficial interest in

---

[12] This computation takes account of the $1 million payment by Blue Coal to IIT to induce it to release its lien on the Blue Coal culm banks. Conceivably, the $1 million release fee paid by Blue Coal to IIT to induce IIT to release its lien on the Blue Coal culm banks should be considered as distributed to Green and paid by him to IIT.

GACC on June 26, 1975, Judge Chabot points out, *supra* p. 580, that "legal ownership of stock at the time of the distribution is not necessarily a requirement for dividend income." As support, Judge Chabot cites section 1.61-9(c), Income Tax Regs., and 10 Mertens, Law of Federal Income Taxation, secs. 38B.18 and 38B.19, at 75-76 (1991), providing that a selling shareholder will be considered the recipient of a dividend even if the dividend is paid to him when he is no longer a shareholder, so long as the dividend was declared before the sale and the selling shareholder was entitled to receive the dividend as of the record date. However, these authorities deal with the income tax accounting question of who must include a declared dividend when stock is sold ex dividend:[13] the selling shareholder or the buying shareholder. In the case before us, no dividend was ever declared, and the prior question is not to whom the dividend is taxable, but whether there was a dividend at all. Even if GACC did pay a dividend, there is no per se requirement that petitioners, as the selling shareholders, be treated as the recipients of that dividend. The regulation cited by Judge Chabot begins by saying that "When stock is sold, and a dividend is both declared and paid after the sale, such dividend is not gross income to the seller." Sec. 1.61-9(c), Income Tax Regs. Inasmuch as no dividend was ever declared by the closely held corporation in this case, it is impossible to know whether the stock traded ex dividend or with the dividend on.

Of course, a dividend need not be declared in order to be a constructive dividend, and it need not be pro rata. *Lengsfield v. Commissioner*, 241 F.2d 508, 511 (5th Cir. 1957), affg. T.C. Memo. 1955-257.[14] Nevertheless, even assuming that a dividend was paid to someone, treating the payment as a dividend to petitioners does not provide a better fit than treating it as a dividend to Green. It is well

---

[13] I.e., stock sold ex dividend is stock that is sold after a dividend has been declared but before it has been paid. In such a situation the selling shareholder will receive a reduced purchase price from the buyer. The seller may attempt to treat the dividend as a dividend to the buyer which the buyer used to pay for the stock. However, if the seller was the owner of the stock on the record date, the dividend is payable to the seller, not the buyer.

[14] In that case, constructive dividends were found to have been paid to parties who remained shareholders of the corporation.

established that a corporate payment for a shareholder's benefit may be a constructive dividend to that shareholder.[15]

To determine whether the excess value of the culm banks was transferred from GACC to petitioners on Green's behalf, the negotiations and the agreements must be considered. The negotiations that led to the two agreements executed on June 26, 1975, as supplemented by the letter agreement of May 28, 1975, reflect that petitioners would only acquire the culm banks *after* they had terminated their stock interests in GACC. The negotiations and Judge Colvin's findings of fact also reflect that petitioners' stock was worth much more than $205,000. In my view, if here was a dividend, it should be attributed to Green rather than petitioners. Petitioners were able to acquire the culm banks from GACC at a bargain because Green, the sole remaining shareholder of GACC and its chairman, used GACC to pay petitioners additional consideration for their stock.

Observing that "there is no evidence that Green ever had even momentary legal or equitable ownership of the culm banks", Judge Chabot concludes, *supra* p. 581, that the $3.08 million in excess value of the culm banks cannot properly be considered a dividend to him. Whether Green had legal or equitable ownership of the culm banks is not relevant to the inquiry. Under the tax law of constructive dividends in bootstrap acquisitions, the purchasing or remaining shareholder will be treated as having received a dividend distribution if the corporation pays an obligation on his behalf.[16] The dividend is "constructive" because the shareholder has not directly received it, but has enjoyed the indirect benefit of having the corporation pay his obligation.[17] Therefore, it is not necessary that Green ever had legal or equitable ownership of the culm banks for him to have received a constructive dividend equal to the excess value of the culm banks.

Judge Chabot also concludes, inasmuch as petitioners did not turn in any share certificates to GACC, that the facts before us are a "poor fit for a redemption" in light of *Estate of Schneider v. Commissioner,* 88 T.C. 906, 939-941 (1987), affd. 855 F.2d 435 (7th Cir. 1988). There the Court held, by application of the step transaction doctrine, that there was a

---

[15] Bittker & Eustice, *supra* par. 7.05, at 7-34 to 7-36.

[16] *Id.*

[17] See 10 Mertens, Law of Federal Income Taxation, sec. 38B.37, at 105-113 (1991).

"deemed redemption" of stock for purposes of section 317(b), even though the shares of stock were actually sold to a third party and the amounts received by the shareholder were essentially equivalent to dividends because there had not been a meaningful reduction of his stock interest in the corporation. Judge Chabot states that because Green negotiated to purchase petitioner's stock, and did not acquire stock different from the stock disposed of by petitioners, the stock transaction is better characterized as a sale between petitioners and Green. This would be true if the only thing that happened was that petitioners disposed of their stock. However, they also received the excess value of the culm banks from GACC in a related simultaneous transaction. Looking at the stock transaction between petitioners and Green by itself, without regard to the culm bank transaction, is just as short-sighted as the majority's approach of looking at the culm bank agreement by itself to determine whether petitioners received a dividend.

In *Smith v. Commissioner,* 82 T.C. 705 (1984), a case factually more similar to the case before us than *Estate of Schneider v. Commissioner, supra,* the Court had no difficulty finding that the transaction could be treated as a redemption under section 302, even though the corporation had not actually acquired the selling shareholder's stock.

Judge Chabot states that petitioners, by arguing that the step transaction doctrine should apply, seek to have the Court impute a step that was never taken, Green's ownership of the culm banks. However, as shown above, there is no need for Green to have acquired ownership of the culm banks in order for him to be treated as the recipient of a constructive dividend.

Of course, it is possible for a selling shareholder to receive a dividend distribution in a bootstrap transaction. As Bittker and Eustice observe, one of the three ways to structure a bootstrap transaction is a seller-dividend and sale.[18] Examples are where the corporation declares and pays a dividend to the selling shareholder before he is obligated to sell his stock, cf. *Reitz v. Commissioner, supra,* or where, under the formal terms of the stock sale agreement, he is still the owner of the stock when he receives the distribution, see *Wil-*

---

[18] See Bittker & Eustice, *supra* par. 9.07, at 9-34.

*son v. Commissioner,* 27 T.C. 976 (1957), affd. per curiam 255 F.2d 702 (5th Cir. 1958); *Gilmore v. Commissioner,* 25 T.C. 1321 (1956); *Coffey v. Commissioner,* 14 T.C. 1410 (1950); see also *Steel Improvement & Forge Co. v. Commissioner,* 36 T.C. 265 (1961), revd. 314 F.2d 96 (6th Cir. 1963), or was the beneficial owner of the stock when the dividend was declared, *Steel Improvement & Forge Co. v. Commissioner, supra; Casner v. Commissioner,* T.C. Memo. 1969-98; see also *Hoffman v. Commissioner,* 47 T.C. 218, 233 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968).

There are also situations, such as a purchase of the stock of a wholly owned subsidiary, in which the parties will try to structure the transaction as a dividend distribution to the corporate seller, coupled with or followed by a sale of all the seller's shares to the buyer. The reason for this choice of form is to give the corporate seller the benefit of the dividends received deduction, or, if consolidated returns have been filed, exclusion of the dividend distribution in its entirety from the income of the selling parent. However, when the dividend and sale transactions have been so interdependent that the distribution received by the seller was obviously part of the consideration for the seller's giving up its stock ownership, as they were here, the corporate seller has not been successful in sustaining dividend treatment, *Waterman Steamship Corp. v. Commissioner,* 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968), and the Commissioner's attempt to characterize a presale distribution to an individual seller as a dividend has been rejected in favor of its taxation as a dividend to the purchasing shareholder and inclusion in the sales proceeds received by the seller. *Casner v. Commissioner,* 450 F.2d 379 (5th Cir. 1971), affg. in part and revg. in part T.C. Memo. 1969-98.

Even if we assumed that petitioners were still the beneficial owners of GACC stock immediately before they received the $3.08 million distribution, it nevertheless cannot properly be characterized as a dividend to them. Petitioners obviously received the distribution in consideration of the termination of their stock interest. See *Smith v. Commissioner, supra; Roth v. Commissioner, supra.* The regulation and case law cited by the majority, see majority op. p. 575-576, all pertain to *continuing* shareholders who benefit from a bargain purchase from their corporation. In this case, petitioner's stock

and other interests in GACC were fully terminated no later than when they received the $3.08 million excess value of the culm banks.

It may well be that petitioners have not carried the burden of showing whether the distribution was a dividend to Green that he used to pay additional purchase price for their stock, or a direct distribution to them in constructive redemption of the bulk of their stock. However, the teaching of *Smith v. Commissioner, supra,* is that the Court need not make this choice in order to arrive at the correct bottom line result. The facts of this case show that the sum of the probabilities is more likely than not that petitioners received the excess value of the culm banks as a payment in exchange for their stock rather than as a dividend. The proper application of the *Smith* case to these facts compels this result.

WHALEN and HALPERN, *JJ.,* agree with this dissent.